(848 P.2d 994)
No. 67,724 [1]

MARTHA FAYE SCHARFE, *Claimant/Appellant*, v. THE KANSAS STATE UNIVERSITY and STATE SELF-INSURANCE FUND, *Respondents/Appellees*, and THE KANSAS WORKERS COMPENSATION FUND, *Appellee*.

Opinion filed October 2, 1992.

*Frank D. Taff*, of Topeka, for appellant.

*Billy E. Newman*, of Topeka, for appellees Kansas State University and the State Self-Insurance Fund.

*Jeff K. Cooper*, of Topeka, for appellee Kansas Workers Compensation Fund.

Before PIERRON, P.J., LARSON and RULON, JJ.

LARSON, J.: In this workers compensation action, Martha Faye Scharfe appeals the trial court's adoption of the Administrative Law Judge's (ALJ) finding that she sustained a 50% permanent partial general disability and that she refused without good cause to undertake vocational rehabilitation.

Scharfe contends (1) the method of calculating the disability adopted by the trial court does not comport with K.S.A. 1991 Supp. 44-510e(a); (2) the trial court's decision is not supported by substantial competent evidence, while a larger disability rating entered by the Workers Compensation Director (Director) is; (3) the determination that Scharfe refused to undertake vocational rehabilitation is not supported by substantial competent evidence; and (4) the trial court failed to state the facts controlling its decision as required by K.S.A. 60-252.

Scharfe was injured on her job as a custodian at Kansas State University (KSU) on November 18, 1987, and on December 11, 1987. Her treating physician, Dr. Michael Schmidt, determined she was suffering from chronic rotator cuff tendonitis of the left shoulder and cervical pain secondary to a musculoligamentous strain resulting in an 11% permanent physical functional impairment of the body as a whole. Dr. Schmidt recommended "a

lifting restriction of 20 pounds utilizing the left upper extremity," "avoidance of repetitive overhead lifting," and that "frequent rotation of the head and neck should be avoided."

Scharfe was unable to return to her job as a custodian at KSU. Scharfe obtained her GED and participated in vocational rehabilitation services, receiving 80 hours of training at KSU's library in filing, working on the microfiche, and discharging books. At the time of the hearing in October of 1990, KSU had not taken Scharfe back in any position and she had been unable to find other employment. On September 17, 1990, and October 15, 1990, Scharfe asked the vocational rehabilitation office to put her case "on hold" because of the pending litigation and until after her deposition had been taken on November 19, 1990.

Scharfe obtained the services and solicited the testimony of Lloyd Dean Langston, a vocational rehabilitation expert, who opined that her access to the open labor market had been reduced by 76% and that her ability to earn a comparable wage had been reduced by 20%.

KSU enlisted the services of vocational rehabilitation consultant Michael Spillers, who opined Scharfe experienced an overall labor market access loss of 25% to 33%. Spillers did not calculate a percentage by which Scharfe's ability to earn a comparable wage had been reduced.

The decision of the ALJ considered the evidence of Scharfe and the opinions of both Langston and Spillers, neither of which were given full weight for various reasons. The ALJ concluded Scharfe experienced a 49% loss of ability to earn a comparable wage and a 52.5% loss of labor market access, resulting in a finding of permanent partial disability of 50%. The ALJ further determined that Scharfe had refused without good cause to undertake vocational rehabilitation, which entitled KSU to suspend payment of temporary total compensation until she consented to resume vocational rehabilitation.

Upon petition for review, the Director found the testimony of neither expert was probative and through his own calculations determined Scharfe's ability to perform work in the open labor market had been reduced by 80%, determined her ability to earn a comparable wage had been reduced by 100%, and granted a permanent partial disability of 90%. The effect of Scharfe's request

to the vocational rehabilitation office to put her case on hold was determined to be "de minimis in the overall rehabilitation process."

KSU filed a petition for judicial review and the trial court agreed with and adopted as its decision the findings and conclusions of the ALJ, from which Scharfe has appealed.

*Does the trial court's method of calculating the disability comport with K.S.A. 1991 Supp. 44-510e(a)?*

The determination of the extent of permanent partial general disability is governed by the following provision of K.S.A. 1991 Supp. 44-510e(a), which reads in applicable part as follows:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced, taking into consideration the employee's education, training, experience and capacity for rehabilitation, except that in any event the extent of permanent partial general disability shall not be less than percentage of functional impairment."

Scharfe contends the trial court erred in its application of this section because the calculation was based upon "loss of labor market access," which is not a term found in the Workers Compensation Act. She cites various earlier decisions construing and applying the changes to the 1974 Act as being applicable here. We choose not to look backwards, but instead to apply the recent cases relating to the above provisions, which became effective July 1, 1987. In *Hughes v. Inland Container Corp.,* 247 Kan. 407, 422, 799 P.2d 1011 (1990), Justice Allegrucci opined:

"We must construe the statute according to context and the approved usage of the language and give effect to the statute as clearly written. [Citation omitted].

"In so construing K.S.A. 1989 Supp. 44-510e(a), we conclude that both the reduction of a claimant's ability to perform work in the open labor market and the ability to earn comparable wages must be considered in determining the extent of permanent partial general disability.

"In order to arrive at a percentage, a mathematical equation or formula must necessarily be utilized. The district court determined to give each element equal weight and averaged the two to arrive at a percentage. The statute is silent as to how this percentage is to be arrived at, and, absent any indication as to how this is to be accomplished, we cannot say that the district court erred in the method adopted and applied in the instant case."

An argument that an exact mathematical computation was required was rejected by our court in *Schad v. Hearthstone Nursing Center,* 16 Kan. App. 2d 50, 51-52, 816 P.2d 409 (1991). We reviewed the *Hughes* decision and held that it did not require the usage of an averaging formula in all cases. Our *Schad* decision affirmed a finding in which the trial court balanced the two factors: the ability to perform work in the open labor market and the ability to earn comparable wages in light of the employee's education, training, experience, and capacity for rehabilitation. Because the award entered was based upon these factors and was within the evidence presented, we affirmed.

We decline to rely on or even utilize the decision of *Ploutz v. Ell-Kan Co.,* 9 Kan. App. 2d 9, 668 P.2d 196 (1983), *aff'd* 234 Kan. 953, 676 P.2d 753 (1984), or to attempt to apply any "super-*Ploutz*" test. In effect, the 1987 amendments have rendered the holding in *Ploutz* inoperable to cases arising since those amendments became effective.

The 1987 amendments to K.S.A. 44-510e(a) were intended to modify the physical impairment theory set forth in *Ploutz* and cases applying to the statute then in effect to prevent the possibility that a worker could change job functions and earn the same wages, but still receive the maximum award for disability because the claimant could not perform work of the same type and character that was being performed at the time of the injury. *Hughes,* 247 Kan. at 415-16. "Previously the focus was on reduction of the worker's ability to engage in the *same type* of work. Now, [since the 1987 amendments] the focus is on reduction of the worker's ability to perform *any type* of work in the open labor market and to earn comparable wages." Kansas Workers' Compensation Handbook § 11.05, p. 11-12 (rev. ed. 1990).

Justice Allegrucci opined in *Hughes* that work disability is:

"(a) The extent to which the ability of the employee to perform work in the open labor market has been reduced, and,

(b) the extent to which the ability of the worker to earn comparable wages has been reduced.

In each case, the employee's education, training, experience, and capacity for rehabilitation must be considered." 247 Kan. at 417.

Under the first prong of the *Hughes* test, the question now becomes: By what percentage has the ability of the employee to perform work in the open labor market been reduced?

"Open labor market" is not defined in our Workers Compensation Act. An explanation of the term "open labor market" is set forth in the Kansas Workers' Compensation Handbook § 9.02, p. 9-3 (rev. ed. 1990):

" 'For the purpose of K.S.A. 44-510e and 44-510g as amended by the 1987 Legislature, "open labor market" means that group of jobs: (1) in which employment opportunities routinely occur; (2) which are offered by several employers in an economic area; and, (3) are the types of jobs for which a worker seeking employment with the claimant's education, training, experience and physical limitations would logically offer his services.

" 'An "open labor market" as used in K.S.A. 44-510e(a) and 44-510g for an injured worker exists where there is a market for the type of services which he/she offers in the geographic area in which he/she offers them and labor market in this instance does not mean that job vacancies must exist since the purpose of the Workers Compensation Act is to compensate for a loss of earning capacity (i.e., the loss of the ability to perform work in the open labor market and earn comparable wages); rather, open labor market means only that type of work or services a worker is offering is generally performed in the geographic area in which the worker is offering them. The open labor market must be reasonably accessible. The legislature did not intend for workers to move their residences or travel unreasonable distances."

See Kansas Workers' Compensation Handbook § 11.05, p. 11-17 (rev. ed. 1990).

In this case, both vocational rehabilitation experts attempted to determine the percentage by which Scharfe's ability to perform work in the open labor market had been reduced. Langston opined Scharfe experienced a 76% reduction in access to the open labor market. He took into account Scharfe's education, training, experience, physical limitations, and capacity for rehabilitation. He limited his consideration to employment possibilities only in Geary and Riley Counties, while Spillers' opinion was based upon a larger area.

Using the Dictionary of Occupational Titles in a computer program, Langston accessed both pre-injury and post-injury jobs that Scharfe could reasonably be expected to perform. In making his determination, Langston did not consider Scharfe's sales clerk experience, her post-injury attainment of a GED, or the training

she received at the KSU library. Further, Langston included jobs in his pre-injury assessment for which Scharfe was not qualified.

Spillers opined Scharfe sustained a labor market access loss of 25% to 33% and took into consideration physical restrictions, education, training, and experience, including her GED, training at the KSU library, and experience as a sales clerk.

Spillers also utilized the Dictionary of Occupational Titles in a computer program essentially the same as the one used by Langston, but felt Scharfe would have been able to perform heavy labor work prior to her injury. The computer program utilized by Spillers, however, did not consider the limitation placed upon the rotation of Scharfe's head and neck.

The expert testimony appeared to be much more related to the loss of labor market access and gave minimal attention to the ability to earn comparable wages, although Langston opined a reduction of 20%. Scharfe's testimony could be utilized to justify her total inability to reobtain employment, for a reduction of 100%.

The position adopted by the ALJ and trial court appears to be a reasonable and just weighing of the *Hughes* factors in the manner we approved in *Schad.* This is apparent from the following statement of the ALJ which was adopted by the trial court:

"Considering the entire record, it is felt that claimant's permanent loss of labor market access is more likely in the area of the difference between what she was earning at the time of her injury and what she could earn at minimum wage working part of the time at a half-time employment and part of the time at full-time employment. This works out to be 49%, which is also about midway between the conclusions reached by Mr. Langston and Mr. Spillers, (52.5%) on the loss of labor market access. Considering the entire record, it is found that claimant's permanent partial disability as a result of her accidental injuries is 50%."

Our court has held in *Brown v. The City of Wichita,* 17 Kan. App. 2d 72, 74-75, 832 P.2d 365 (1992), that while the trial court is required to consider both statutory factors, it may determine the weight to be given to both. The ALJ and trial court might have been more clear in their decision as to the consideration of the ability to earn comparable wages, but the trial court's opinion was based upon substantial competent evidence that the ability to earn comparable wages has been reduced by 49% and the

ability to perform work in an open labor market has been reduced by 52.5%. Its conclusion that Scharfe suffered a 50% permanent partial disability must be affirmed.

*Was the decision that Scharfe sustained a 50% partial general disability supported by substantial competent evidence?*

"This court's scope of appellate review for workers compensation cases is the same as the scope of review in other civil cases. Evidence must be viewed in the light most favorable to the prevailing party. If the district court's findings of fact are supported by substantial competent evidence, this court is bound by those findings. We have jurisdiction to review all questions of law." *Angleton v. Starkan, Inc.,* 250 Kan. 711, Syl. ¶ 1, 828 P.2d 933 (1992).

"The term 'substantial evidence' is defined in workers compensation cases to mean evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing substantial basis of fact from which the issue tendered can be reasonably resolved." *Angleton,* 250 Kan. 711, Syl. ¶ 3.

In examining the testimony of Dr. Schmidt, Langston, Spillers, and Scharfe in light of the comments previously made, it is clear there was substantial competent evidence to sustain the award.

*Was the determination that Scharfe refused to undertake vocational rehabilitation supported by substantial competent evidence?*

The evidence is clear that Scharfe did not participate in vocational rehabilitation for a period of time. This was not because of her inability to do so, but appeared to be related to the pending claim. This finding by the trial court is clearly sustained by substantial competent evidence and is affirmed.

*Did the trial court fail to state the facts controlling its decision as required by K.S.A. 60-252?*

Scharfe did not object to the trial court's findings at the trial court level and her failure to do so precludes appellate review of this issue. See *Celco, Inc. of America v. Davis Van Lines, Inc.,* 226 Kan. 366, 368-69, 598 P.2d 188 (1979); *Burch v. Dodge,* 4 Kan. App. 2d 503, 507, 608 P.2d 1032 (1980).

The trial court's memorandum decision incorporated the ALJ's award and satisfies the requirements set forth in K.S.A. 60-252

and Rule 165 (1991 Kan. Ct. R. Annot. 126). This issue has no merit.

Affirmed.