(887 P.2d 140)
No. 71,139

TAMMY G. FOULK, *Appellant,* v. COLONIAL TERRACE and NATIONAL UNION FIRE INSURANCE COMPANY, *Appellees.*

Opinion filed December 16, 1994.

*Lawrence M. Gurney,* of Wilson, Lee & Gurney, of Wichita, for appellant.

*M. Doug Bell*, of Hall, Levy, Lively, DeVore & Bell, of Coffeyville, for appellees.

Before RULON, P.J., BRAZIL and GREEN, JJ.

RULON, J.: Tammy G. Foulk, claimant, appeals from the decision of the Appeals Board for the Kansas Division of Workers Compensation (Board).

Essentially, we must decide if the Board erred in its award of permanent partial general disability. We affirm.

On August 22, 1991, claimant suffered a lower back injury while working at Colonial Terrace (Colonial), a nursing home. Claimant worked at Colonial as a Certified Nurses Aide (CNA). Claimant advised her supervisor of this injury. The day after her injury, she was unable to return to work.

Claimant visited the company physician, Dr. Charles L. Empson, who put her on Flexeril and Darvocet and told her not to return to work for two or three weeks. At the end of this time, claimant attempted to return to work but was only able to work approximately two days before the pain began increasing. She visited Dr. Empson's partner, Dr. Thomas M. Auxter, who took her off work for another two or three weeks. She later returned to work on modified duty for about eight weeks. Claimant testified she was taken off work at that time by the regional district manager for the owners of Colonial. The administrator for Colonial testified, however, that claimant came into her office and said she was quitting because she could not handle the job.

After being seen by Dr. Empson, claimant was seen by Dr. David L. Black, an orthopedic surgeon, who became her treating physician. During Dr. Black's physical examination of claimant, he found she was tender over the sacroiliac joint of her back, but the rest of her exam was normal. Dr. Black diagnosed claimant with sacroiliitis, or inflammation of the sacroiliac joint. He treated claimant with trigger point injections, which did not alleviate her pain. After a follow-up visit, he restricted claimant's activities, but she returned to work.

After claimant's return to work aggravated her condition, Dr. Black specifically laid out a number of restrictions on her activ-

ities. He advised claimant she could lift 10 to 20 pounds 30 times an hour, 30 pounds 4 times an hour, and 40 to 50 pounds 2 times an hour. He instructed her never to lift 60 pounds or more. In his deposition, Dr. Black testified claimant could bend, stoop, twist, squat, kneel, or crawl on a frequent basis. In his notes, however, he stated, "[S]he should be permanently restricted in the amount of bending and twisting that she should do and she should not be bending or stooping more than 2 times an hour." Claimant testified she could not work as a CNA under the restrictions Black imposed.

Dr. Black recommended a work hardening program of therapy for claimant, but she refused to participate in this. Claimant advised Dr. Black that she had been through a lot of therapy and did not think work hardening would be helpful. Further, she stated she had difficulty arranging transportation.

Dr. Black stated claimant suffered a three percent whole body impairment as a result of her injury.

Claimant was also seen by Dr. P. Brent Koprivica. At the initial examination, Dr. Koprivica recommended a rehabilitative program for conditioning and work hardening, which claimant elected not to follow. At a subsequent visit, Dr. Koprivica took x-rays of claimant's back which showed degenerative changes. Dr. Koprivica diagnosed claimant with chronic nonradicular low back pain with chronic left sacroiliac dysfunction. He tested for symptom magnification but did not find any evidence that claimant was magnifying her symptoms.

Dr. Koprivica also indicated claimant had a congenital problem of pelvic obliquity; a leg length discrepancy. Dr. Koprivica believed the injury claimant suffered at work aggravated her congenital condition.

Dr. Koprivica also placed restrictions on claimant's activities. He restricted claimant to one-time lifts of 50 pounds and repetitive lifts of only 25 pounds. He stated claimant was capable of working in a light-medium to medium physical demand level job as defined in the Department of Labor's Dictionary of Occupational Titles. He advised that claimant should avoid repetitive bending, pushing, pulling, twisting, or lifting activities.

Dr. Koprivica opined claimant suffered a five percent impairment to her body as a whole.

Dr. Ely Bartal also examined claimant. He took one x-ray of her back, which showed nothing. He stated claimant had an excellent range of motion and good reflexes. He did note, however, that claimant had a leg length discrepancy. In his opinion, this was a congenital condition with no relationship to her accident. He recommended she begin physical therapy and return to work as soon as possible. Further, he did not find any disability related to her accident and did not think she needed any treatment after he saw her. He stated he recommended therapy as "more a fitness thing rather than a treatment." In a letter to Dr. Empson, however, Dr. Bartal stated claimant had a remote lumbosacral sprain.

Colonial offered claimant a different job, as a dietary aide, in an attempt to keep her employed without pain. The job was offered at the same rate of pay as a nursing aide. Claimant did not accept this position. Claimant stated she turned this position down because she felt she could not perform certain aspects of the job in light of the medical restrictions she was under. Dr. Black stated a job as a dietary aide would not be a problem for claimant unless it reached a point where claimant would be bending down in the carts. A repetitive bending motion would be a problem for her. Dr. Koprivica stated he believed claimant could perform the job duties of a dietary aide within the restrictions he had placed upon her.

In preparation for her workers compensation case, claimant was interviewed by Jerry D. Hardin, a personnel/human resources consultant. Hardin performed an analysis of claimant's access to the job market after her injury, taking into account her education, background, experience, and capacity for rehabilitation. Using the restrictions and limitations Dr. Black had placed on claimant, Hardin found she had a 73 percent loss of access to the open labor market in Kansas and a 69 percent loss of access to the open labor market in Montgomery County, where she lived. Using Dr. Koprivica's restrictions and limitations, claimant suffered a 59 percent loss of access to the open labor market in Kansas and a 54 percent loss of access to the open labor market in Montgomery

County. Hardin stated if he used Dr. Bartal's records in calculating claimant's loss of access to the open labor market, there was no loss and no work disability.

Karen Crist Terrill, a vocational rehabilitation counselor, at the request of the employer and insurance company, also met with claimant and evaluated her. Terrill concluded, based on medical records and the history provided by claimant, that claimant had suffered an 18 percent loss of access to the open labor market in Montgomery County. However, based only on Dr. Black's restrictions, claimant did suffer a 41 percent loss of access to the open labor market. It was based on Dr. Koprivica's restrictions that Terrill found the 18 percent loss. Terrill opined that claimant's ability to earn a comparable wage remained the same: "[S]he still retains the capabilities of earning a comparable wage, as a result, she has suffered a zero percent loss of wage earning capacity." Terrill further stated that if Dr. Bartal's records for claimant were used, claimant had a zero percent loss of access to the open labor market.

In preparation for litigation, respondent's insurer in this case hired a private investigator, Robert D. Keal, to watch claimant. Keal observed, videotaped, and took still photographs of claimant push-mowing her lawn with a power mower. Keal further observed that claimant, after mowing, picked up trash along the curb in front of her house. Keal stated he observed no signs of distress while claimant was walking, pushing, pulling, stooping, bending, twisting, turning, and reaching. He did, however, agree that the lawn mower may have been self-propelled, and claimant spent only 18 minutes mowing the lawn and about 5 minutes picking up the trash.

Claimant had testified in her deposition that she could not mow her lawn or pick up items around the yard. She stated she could pick up pieces of paper in the yard but not rocks or things of that nature. Further, claimant had testified she had not mowed the yard since the time of her accident.

Dr. Black testified during his deposition that pushing a lawn mower and picking up trash would be prohibited by the restric-

tions he had placed upon claimant. Dr. Koprivica, however, testified mowing or picking up trash in the yard would not violate the restrictions he had placed upon claimant.

The Administrative Law Judge (ALJ) determined claimant met her burden of proof to show a loss of access to the work market and that she had sustained a permanent injury resulting in permanent limitations on her abilities. However, the ALJ also found claimant had a zero percent wage loss in that she retained the ability to return to work and earn a comparable wage. The ALJ determined claimant had a 22 percent permanent partial general bodily disability and gave her an award for this, as well as 33 weeks of temporary total disability for her time off of work.

Colonial and its insurer timely applied to the Board for review of the ALJ's decision.

The Board determined claimant had sustained a five percent permanent partial general bodily disability from the accidental injury she had suffered on the job. However, the Board found she had not met her burden of proof to show a loss of access to the open labor market. The Board noted claimant did have some permanent limitations, but those were imposed based on the subjective complaints of claimant. The Board further found claimant's testimony about those complaints not credible "in light of the videotape and other evidence taken as a whole which shows claimant capable of performing tasks beyond the restrictions imposed by Dr. Black." The Board further found claimant had refused to participate in work hardening rehabilitation or even attempt the job as a dietary aide.

The Board used the test for permanent partial general disability in K.S.A. 1988 Supp. 44-510e(a) and held:

"Based upon the claimant's demonstrated ability to perform tasks outside the modified restrictions of Dr. Black, the fact that the restrictions of both Dr. Black and Dr. Koprivica were based largely upon the claimant's subjective complaints, considering the claimant's lack of credibility, her unwillingness to participate in the recommended work hardening programs, and her unwillingness to attempt the dietary aide position, the Appeals Board finds that claimant has not sustained her burden of proving a work disability in excess of the five percent functional rating given by Dr. Koprivica."

Consequently, the Board awarded claimant a five percent permanent partial disability in addition to her temporary total disability award.

Claimant argues the Board erred in its application of K.S.A. 1988 Supp. 44-510e in her case; she contends that because the manner in which a statute should be applied is a matter of law, this court should engage in an unlimited review of the Board's decision. Respondent, Colonial Terrace, contends the Board simply made a finding of fact that claimant had not met her burden of proof to show that she has a work disability that exceeds her functional impairment.

Claimant does raise one question of law in regard to interpreting 44-510e. She argues the presumption found in 44-510e, that a worker has no work disability if that worker engages in work for comparable wages, does not apply to cases where the worker has the ability to engage in such work but does not do so. Claimant argues the statute "clearly says 'engages in any work' *not* 'possess the ability to engage in work.'"

Interpretation of a statute is a question of law. *State v. Donlay*, 253 Kan. 132, Syl. ¶ 1, 853 P.2d 680 (1993). Therefore, this court's review of this argument is unlimited. See *Memorial Hospital Ass'n, Inc. v. Knutson*, 239 Kan. 663, 668, 722 P.2d 1093 (1986).

K.S.A. 1988 Supp. 44-510e(a) was in effect at the time of claimant's injury and provided in relevant part:

"[P]ermanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced, taking into consideration the employee's education, training, experience and capacity for rehabilitation, except that in any event the extent of permanent partial general disability shall not be less than percentage of functional impairment. . . . There shall be a presumption that the employee has no work disability if the employee engages in any work for wages comparable to the average gross weekly wage that the employee was earning at the time of the injury."

When interpreting a statute, this court should give effect to the intent of the legislature to the extent that intent can be ascertained. *Martindale v. Tenny*, 250 Kan. 621, 626, 829 P.2d 561

(1992). If the language of the statute is plain and unambiguous, this court "must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be." 250 Kan. 621, Syl. ¶ 2. In doing so, the court should give words in common usage their ordinary and natural meanings. *Bank IV Wichita v. Plein*, 250 Kan. 701, 705-06, 830 P.2d 29 (1992). However, if interpreting one section of an act according to its literal import would "contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law." *Jackson v. City of Kansas City*, 235 Kan. 278, 319, 680 P.2d 877 (1984).

If a term or phrase within the statute is ambiguous, this court can determine its meaning by reference to its context and associated words. See *Farm Bureau Mutual Ins. Co. v. Carr*, 215 Kan. 591, 596, 528 P.2d 134 (1974). Legislative intent should be determined from a general consideration of the entire act. *Todd v. Kelly*, 251 Kan. 512, 516, 837 P.2d 381 (1992). In addition, this court must presume the legislature intends for the courts to give an act a reasonable interpretation to avoid unreasonable or absurd results. 251 Kan. at 520.

Construing K.S.A. 1988 Supp. 44-510e(a) to allow a worker to avoid the presumption of no work disability by virtue of the worker's refusal to engage in work at a comparable wage would be unreasonable where the proffered job is within the worker's ability and the worker has refused to even attempt the job. The legislature clearly intended for a worker not to receive compensation where the worker was still capable of earning nearly the same wage. Further, it would be unreasonable for this court to conclude that the legislature intended to encourage workers to merely sit at home, refuse to work, and take advantage of the workers compensation system. To construe K.S.A. 1988 Supp. 44-510e(a) as claimant suggests would be to reward workers for their refusal to accept a position within their capabilities at a comparable wage.

Claimant also contends, however, that the uncontroverted evidence in this case is that her permanent partial disability exceeds her functional impairment. This is basically an issue of whether

there is sufficient evidence to support the Board's finding that claimant did not meet her burden of proof on this issue.

In a workers compensation case, the finder of fact's determinations should be affirmed if they are supported by substantial competent evidence. *Miner v. Bruenger & Co.*, 17 Kan. App. 2d 185, 188, 836 P.2d 19 (1992). This court "must view the evidence in the light most favorable to the prevailing party and determine whether there is substantial competent evidence to support the findings of the trial court." See *Elder v. Arma Mobile Transit Co.*, 253 Kan. 824, 827, 861 P.2d 822 (1993). If there is substantial competent evidence to support the district court's findings, this court is bound by those findings. *Duncan v. City of Osage City*, 13 Kan. App. 2d 364, 366, 770 P.2d 843, *rev. denied* 245 Kan. 783 (1989). Further, those findings will be upheld on review even if there is evidence in the record "which, if given credence by the trial court, would have supported contrary findings." *Elder*, 253 Kan. at 826. "Even if this court feels that the weight of the evidence, as a whole, is against the findings of fact made by the district court, it may not disturb those findings if they are supported by substantial competent evidence." *Tovar v. IBP, Inc.*, 15 Kan. App. 2d 782, 784, 817 P.2d 212, *rev. denied* 249 Kan. 778 (1991).

In workers compensation cases, substantial evidence is " 'evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing substantial basis of fact from which the issue tendered can be reasonably resolved.' [Citation omitted.]" *Angleton v. Starkan, Inc.*, 250 Kan. 711, 716, 828 P.2d 933 (1992).

In a workers compensation case, if evidence is presented that is uncontradicted, and not improbable, unreasonable, or shown to be untrustworthy, the finder of fact cannot disregard this evidence. Uncontradicted evidence should generally be regarded as conclusive. *Demars v. Rickel Manufacturing Corporation*, 223 Kan. 374, 380, 573 P.2d 1036 (1978).

In this case, the Board chose to disbelieve claimant's testimony in light of the fact that she had lied under oath and there was

evidence she could perform activities of which she claimed she was not capable. Because the various estimates of her disability and loss of access to the open labor market were based upon her subjective complaints, which the Board did not believe, the Board did not find these estimates to be credible. It is not the function of this court to reweigh the credibility of the testimony and the evidence. *Adamson v. Davis Moore Datsun, Inc.*, 19 Kan. App. 2d 301, 307, 868 P.2d 546 (1994).

Uncontroverted evidence is binding on the Board only to the extent that evidence is not untrustworthy, improbable, or unreasonable. Here, the Board found the uncontroverted evidence that claimant's work disability exceeded her functional impairment to be untrustworthy because it was based upon claimant's complaints and claimant was not credible. Therefore, the Board did not err in disregarding this evidence and in basing claimant's award solely on the extent of her functional impairment of five percent.

Affirmed.