(944 P.2d 179)
No. 76,829

FANNIE L. COPELAND, *Appellee*, v. JOHNSON GROUP, INC., and TRAVELERS INSURANCE COMPANY, *Appellants,* and KANSAS WORKERS COMPENSATION FUND.

Opinion filed August 29, 1997.

*Frederick J. Greenbaum* and *Douglas M. Greenwald,* of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for the appellant.

*Robert W. Harris,* of Kansas City, for the appellee.

Before GREEN, P.J., PIERRON, J., and PHILIP C. VIEUX, District Judge, assigned.

PIERRON, J.: In this workers compensation case, Johnson Group, Inc., (Johnson) and Travelers Insurance Company (Travelers), appeal the decision of the Workers Compensation Board (Board) awarding Fannie L. Copeland permanent partial disability benefits based on a finding of 80% work disability. Johnson argues the Board erred in awarding permanent partial disability because Johnson proffered accommodated work to Copeland within her physical restrictions. Alternatively, Johnson argues there is no evidence to support the Board's finding that Copeland had a 100% wage loss. We reverse and remand for further proceedings.

For nearly 6 years, Copeland worked as a press operator at Duggins Cleaners, a dry cleaning facility owned by Johnson. She testified she began having pain in her right arm and hand in January 1993. The pain gradually moved to her left arm and hand. Through Johnson, she sought and received medical treatment from Dr. John O'Mailey, who first prescribed splints and then sent her to Dr. Brad Storm for evaluation.

Copeland's last day of work was September 22, 1993. On September 27, 1993, Dr. Storm diagnosed bilateral carpel tunnel syndrome. On October 22, 1993, Dr. Storm performed a bilateral endoscopic carpal tunnel release. Two weeks after the surgery, Dr. Storm released her to return to work. She testified she continued

to have pain in her hands and Dr. O'Mailey prescribed physical therapy through December 1993.

In December 1993, both Dr. Storm and Dr. O'Mailey released Copeland to return to work for Johnson. Dr. Storm gave her a work restriction of no lifting over 20 pounds. He stated she was not back to full strength and the only way to regain full strength and endurance was for her to gradually use her hands again. Dr. O'Mailey gave Copeland restrictions of no lifting over 20 pounds and no sweeping floors.

Steven Stevener was the production or plant manager and Copeland's supervisor in December 1993. He testified he was advised by his supervisor, Jerry Miller, that Copeland had been released to return to work on December 17, 1993. Stevener said he had a light duty position waiting for Copeland in December 1993 that would have accommodated the lifting restrictions. Stevener testified in his deposition that Copeland did not return to work on December 17, 1993, because she was having problems with transportation. Miller told him Copeland would be returning to work on January 1, 1994. Stevener stated Copeland neither called nor reported for work from January 1 to January 5 and was terminated on January 6, 1994.

Stevener testified in his deposition that he had no conversations with Copeland about coming back to work. He was also unclear whether he saw the release restrictions from Dr. Storm or Dr. O'Mailey and was not a party to any conversation where light duty was discussed with Copeland.

Copeland testified at the hearing that she was in too much pain in December 1993 and January 1994 to return to work. She claims to have had a telephone conversation with Stevener in January 1994, where she expressed to him that she was having pain and was told to take her time returning. After Copeland's termination, she began receiving unemployment compensation in February 1994.

On March 18, 1994, Copeland was examined by Dr. Nathan Shechter, who also concluded she suffered from bilateral carpal tunnel syndrome. Shechter concluded Copeland had disability "of 10% of the body as a whole, permanent partial. The patient may

need physical therapy from time to time, and medications such as anti-inflammatories." Dr. Shechter issued an additional report dated April 6, 1994:

"The following is a reply to your April 4, 1994 letter, regarding the above mentioned patient.

"It is the opinion of this examiner that Mrs. Copeland cannot return to the same type of work as she did before, which requires repetitive use of both hands and wrists and full strength and endurance of the upper extremities. She should be restricted to lifting 20 pounds of weight maximum. She cannot do the sweeping of floors or any type of job that requires repetitive use of the upper extremities."

Dr. Storm testified he examined Copeland again on January 12, 1994. He concluded she had reached the maximal medical improvement and her motion, sensation, grip, and pinch strength were all objectively measured pursuant to the AMA Guides to the Evaluation of Permanent Impairment (4th ed. 1995). Dr. Storm's report stated:

"Strictly following the AMA Guidelines she would receive a zero percent impairment for limitations of range of motion, strength and sensation. Customarily zero to five percent is awarded at the level of the wrist for limitations related to any symptoms from permanent scarring. This would translate into a zero to six percent whole body impairment."

In June 1994, Dr. Storm restricted Copeland from gripping tools that vibrate more than 5 minutes each hour. Dr. Storm opined that Copeland's job as a press operator was not one that would place her at high risk for recurrence of carpal tunnel syndrome.

Based on medical records and reports from Dr. Shechter and Dr. O'Mailey, Dick Santner, Copeland's vocational rehabilitation expert, concluded that she suffered an 88% loss of access to the open labor market and a 26% loss of wage earning capacity. Santer indicated that if Copeland went back to work, she would earn at most $5 per hour.

Johnson presented vocational rehabilitation evidence from Gary Gammon. Based on the reports of Dr. Shechter and Dr. O'Mailey, Gammon concluded Copeland would have a 54.38% loss of access to the open labor market and, based on the report of Dr. Storm, she had between 1% and 3% loss of access to the open labor market. Gammon stated that with Dr. Shechter's and Dr. O'Mailey's

restrictions, Copeland would have 12.5% loss of earning capacity. Using Dr. Storm's restrictions, Gammon opined that Copeland would have no loss of comparable wage earning capacity. As to Copeland's task-performing abilities relating to her prior 15 years of employment, Gammon opined loss of 23.5% under Dr. Shechter and 1.5% under Dr. Storm.

Prior to the hearing before the administrative law judge (ALJ), the parties stipulated to Copeland's functional impairment of 10% to the body as a whole. Following a presentation of all the evidence, the ALJ only granted benefits to Copeland in the amount of the stipulated 10% functional impairment. The crux of the ALJ's decision is as follows:

> "The evidence clearly reflects that an accommodated position had been offered the claimant by the respondent, and that such was within her ability to perform such work. The evidence reflects that the claimant had refused to even attempt to return to work for the respondent. Therefore, the claimant has not met her required burden of proof to establish that she has sustained a work-related disability in excess of the functional impairment agreed to by the parties. Under the facts presented, a presumption of no work disability is warranted. *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277[, 887 P.2d 140](1994). It is therefore found that she is entitled to be compensated by the respondent-insurance carrier and Kansas Workers' Compensation Fund in the agreed upon apportionment, for 10% permanent partial disability to the body as a whole, such being a functional impairment."

The ALJ granted a total award of $9,644.81.

Copeland appealed to the Board. The Board disagreed with the ALJ's decision, finding the rationale of *Foulk* did not apply. The Board made several findings essential for its decision: (1) In December 1993, Copeland contacted Stevener and advised him she could not return to work at that time because she was still in pain; (2) Stevener advised her to take her time as work was slow; (3) Copeland telephoned Johnson and was told she was terminated, but she was not given a reason; and (4) the record was devoid of evidence that Johnson offered Copeland work within her permanent work restrictions *as set forth by Dr. Shechter*.

The Board concluded Copeland was entitled to work disability in excess of her functional impairment rating. The Board found the only testimony as to Copeland's percentage of task loss, in the

"opinion of the physician," came from Dr. Shechter, who stated that she lost 60% of her ability to perform work tasks she had performed during 15 years of previous employment. The Board decided that since Copeland was unemployed, she was entitled to 100% wage loss. Averaging the percent of task loss and the wage loss, the Board concluded that Copeland was entitled to a work disability award of 80%. This gave her a total award of $67,070.85.

One member of the Board dissented and agreed with the ALJ's finding that Johnson offered Copeland an accommodated position and it was within her ability to perform such work. The dissenting Board member concluded that following Copeland's release by Dr. Storm, Johnson offered Copeland light-duty work within Dr. Storm's restrictions and that Copeland's decision to not return to work was for personal reasons unrelated to her restrictions or injury. The dissenting Board member stated that if Copeland felt she could not perform the accommodated job, she should have communicated this problem to Johnson and given it an opportunity to address her concerns. Since she failed to perform the accommodated employment, the dissenting opinion concluded, the principles of *Foulk* were applicable and Copeland was only entitled to an award for her functional impairment.

The dissent pointed out that Dr. Shecter's restrictions were not issued until 3 months after Copeland's termination.

K.S.A. 44-556(a) specifically subjects workers compensation appeals to the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* That Act limits the relief granted on appeal. K.S.A. 77-621(c). K.S.A. 77-621(c) states that the court shall grant relief only if it determines any one or more of the eight conditions stated are present, including the following:

"(4) the agency has erroneously interpreted or applied the law;

. . . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act."

In 1993, 44-556(a) was amended to limit this court's review of an order entered by the Board to questions of law. K.S.A. 44-

556(a). However, whether the Board's findings of fact are supported by substantial competent evidence is a question of law. See *Berry v. Boeing Military Airplanes*, 20 Kan. App. 2d 220, 223, 885 P.2d 1261 (1994).

"In workers compensation cases, substantial evidence is ' "evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing substantial basis of fact from which the issue tendered can be reasonably resolved." [Citation omitted.]' *Angleton v. Starkan, Inc.*, 250 Kan. 711, 716, 828 P.2d 933 (1992)." *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 285, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995).

The parties do not dispute that Copeland's last day of work, September 22, 1993, was the date of her accident or injury.

"The date of accident or date of occurrence in a workers compensation action involving carpal tunnel syndrome is the last day on which a claimant performs services for his or her employer and is required to stop working as a direct result of the claimant's pain and disability resulting from carpal tunnel syndrome." *Berry*, 20 Kan. App. 2d 220, Syl. ¶ 3.

As a result, 1993 amendments to 44-510e(a), effective July 1, 1993, are applicable to Copeland.

Prior to July 1, 1993, a section of 44-510e(a) contained a presumption against permanent partial disability benefits. This statutory language provided: "There shall be a presumption that the employee has no work disability if the employee engages in any work for wages comparable to the average gross weekly wage that the employee was earning at the time of the injury." K.S.A. 1992 Supp. 44-510e(a). The 1993 amendments removed the term "presumption" and attempted to clarify the situation by providing that "[a]n employee shall not be entitled to receive permanent partial general disability compensation in excess of the percentage of functional impairment as long as the employee is engaging in any work for wages equal to 90% or more of the average gross weekly wage that the employee was earning at the time of the injury." K.S.A. 44-510e(a).

The court in *Lee v. Boeing Co.*, 21 Kan. App. 2d. 365, 371, 899 P.2d 516 (1995), discussed the 1993 amendments to 44-510e(a):

"The legislative history indicates that the 1993 amendments are merely the latest in a series of attempts by the legislature to ensure that a worker does not earn substantial post-injury wages while collecting work disability benefits. The 1993 amendments do not amount to a change in law surrounding the presumption but are merely a clarification."

The ultimate question for resolution in this first issue is whether Johnson offered Copeland an accommodated position in December 1993. Stated another way, the question presented is whether Copeland was given the opportunity or refused the opportunity to engage in any work for wages equal to 90% of the gross weekly wage before the accident.

The ALJ determined that "[t]he evidence clearly reflects that an accommodated position had been offered the claimant by the respondent, and that such was within her ability to perform such work. The evidence reflects that the claimant had refused to even attempt to return to work for the respondent." The Board determined that "the record is devoid of evidence that respondent offered claimant work within her permanent work restrictions as set forth by *Dr. Shechter*." (Emphasis added.)

In *Foulk*, the claimant sustained a work-related accident to her lower back while performing her job tasks as a certified nurses' aide. Her treating physicians imposed several physical restrictions. Her employer offered her an accommodated job as a dietary aide in an attempt to keep her employed without pain. The dietary aide position was offered at the same rate of pay as her previous nurses' aide position. The claimant did not accept the position because she felt she could not perform certain aspects of the job in light of her doctor's medical restrictions.

The Board in *Foulk* declined to award the claimant permanent partial disability benefits in an amount higher than her functional impairment. First, the evidence indicated she could perform activities outside her doctors' restrictions. Second, the restrictions were based on the claimant's subjective complaints. Third, she was unwilling to participate in a work hardening program. Last, she declined to even attempt the accommodated dietary aide position.

The claimant appealed to this court, arguing that the presumption that a worker has no disability if that worker engages in work

for comparable wages did not apply to cases where the worker has the ability to engage in such work, but chooses not to work. The claimant argued that the statutory language stated "engage in any work" *not* "possess the ability to engage in work." This court disagreed with the claimant's interpretation of the statute:

"Construing K.S.A. 1988 Supp. 44-510e(a) to allow a worker to avoid the presumption of no work disability by virtue of the worker's refusal to engage in work at a comparable wage would be unreasonable where the proffered job is within the worker's ability and the worker has refused to even attempt the job. The legislature clearly intended for a worker not to receive compensation where the worker was still capable of earning nearly the same wage. Further, it would be unreasonable for this court to conclude that the legislature intended to encourage workers to merely sit at home, refuse to work, and take advantage of the workers compensation system. To construe K.S.A. 1988 Supp. 44-510e(a) as claimant suggests would be to reward workers for their refusal to accept a position within their capabilities at a comparable wage." 20 Kan. App. 2d at 284.

In *Guerrero v. Dold Foods, Inc.*, 22 Kan. App. 2d 53, 913 P.2d 612 (1995), the court expounded on *Foulk*. The claimant was injured on the job, and after surgery, she was given a job labeling and weighing bacon instead of packaging bacon as she had done before the injury. She notified her supervisor that the repetitive work was causing her problems and was fired for refusing to work within her restrictions. The Board awarded the claimant permanent partial general disability benefits. On appeal, the employer relied on *Foulk* for its argument that the claimant was not entitled to work disability because she was engaged in a job that paid comparable wages. The *Guerrero* court distinguished *Foulk* in denying the employer's argument.

"The key word in that ruling, 'refusal,' distinguishes *Foulk* from the case before us. In *Foulk*, the claimant never attempted to perform the new job offered by the employer. In this case, Guerrero attempted to work within her work restrictions. Moreover, Dr. Melhorn notified Dold that Guerrero's new job assignment was repetitive and increased her chances of further injury." 22 Kan. App. 2d at 57.

Johnson argues this case falls within the parameters of *Foulk*, not *Guerrero*. Johnson states that Copeland was released to work with temporary restrictions in December 1993 and Stevener had a light-duty accommodated job waiting for her at Duggins. Johnson asserts Copeland did not return to work, claiming transportation

problems and continued physical pain. She then failed to report to work in early January 1994 and was terminated as a result.

Johnson indicates that Dr. Storm released Copeland in December 1993 for full duty work with only a temporary 20-pound weight lifting restriction. Johnson argues that Copeland should have returned to work at that time and, at a minimum, attempted the light duty work it had waiting for her. Johnson even extended the starting date to January 1, 1994, upon Copeland's request.

Johnson takes issue with the Board's finding that the record was devoid of evidence Copeland was offered a job within Dr. Shechter's work restrictions. Johnson maintains that Dr. Shechter was retained only for the purposes of the workers compensation case and there is no way it could have known the restrictions set by Dr. Shechter in March and April 1994, when it tried to accommodate Copeland pursuant to Dr. Storm's restrictions in December 1993 and January 1994.

Johnson insists it should not be required to hold open a job indefinitely, particularly where, as here, it became clear the injured employee had no intention of returning to work. Johnson also argues the only way an employee's restrictions can be monitored and evaluated is for the injured employee to return to work, which Copeland refused to do.

On the other hand, Copeland states she was terminated before she was given her permanent restrictions and before she was seen by anyone other than the doctor used by Johnson. She argues the policy reasons set forth in *Foulk* do not apply to her because in December 1993 and January 1994 there were no permanent restrictions established, no evidence of a plan for accommodated employment, and no communication of any such accommodated employment offer. As a result, she contends there cannot be a refusal of employment.

At the administrative hearing, Copeland testified that when she called Duggins on December 17, 1993, to report she was having transportation problems and also still in pain, she was not given a specific return date. Copeland testified as follows:

"Q. [MR. GREENBAUM (Johnson's attorney)] And do you remember calling Duggins and telling them you were having trouble with your car at that time?

"A. [COPELAND] I told Jerry [Steve Stevener's supervisor], 'I'm having trouble with my car, but I'm still in pain.' I constantly talked about pain to everybody I talked to.

"Q. Do you remember telling Jerry that you'd be back to work, and he told you to be back to work about the first of January of 1994?

"A. Jerry did not give me a date. Jerry told me, 'Okay, Fannie,' when I talked to him. I told him—he said, 'Fannie, will you be able to come back in January?' I said I'd do my best. I called Steve because I wasn't able to make it.

"Q. When is it you say you talked to Steven?

"A. I talk to Steve January—I can't remember the day it was exactly, but I talked to Steve."

Later, the following exchange occurred:

"Q. [GREENBAUM] Jerry told you to call him again or make sure you came back in after the first of the year.

"A. [COPELAND] I called Steve because Jerry was not there. I could not talk to him, so that's when I talked to Steve. That's when Steve told me what he told me.

"Q. It's your testimony that Steve said to come in whenever you want?

"A. No. He told me, he said, 'Fannie, take your time.' He said, 'Don't be in a hurry.' He said, 'Don't do like Betty did. She come in here and she's going through hell. She's in constant pain and complaining all the time.' He said, 'Take your time, because we're not really doing that much right now. You know, how the slack season go.' [sic] I know those are Steve's exact words because I talked to him on the phone."

Stevener disputes that such conversation occurred. He testified in his deposition that he never had any conversations with Copeland in December 1993 or January 1994 about her coming back to work at Duggins.

As is demonstrated rather vividly in the present case, this court's standard of review is rather limited. The Board made a finding of fact that in December 1993, Stevener advised Copeland to take her time in coming back to work because business was slow. Copeland testified this conversation occurred. Stevener testified it did not. The Board found Copeland's testimony more persuasive. This court may not reweigh the evidence presented at the agency hearing or determine the weight or credibility of the witnesses' testi-

mony. *City of Wichita v. Employment Security Bd.*, 13 Kan. App. 2d 729, 733, 779 P.2d 41 (1989).

On the other hand, Johnson correctly argues it would have been impossible for it to offer Copeland an accommodated job within the permanent restrictions set by Dr. Shechter. This portion of the Board's majority opinion is very puzzling. As pointed out by the dissent, Dr. Shechter's opinion was not rendered until 3 months after Copeland was terminated for alleged refusal to return to work. However, we acknowledge the Board might have believed there was no accommodated position offered to Copeland at all. Perhaps not only were the restrictions made by Dr. Shechter not considered, but also the restrictions made by the treating physicians were ignored.

We remand for a clarification on this issue.

Johnson also argues the Board's award of 80% permanent partial disability is unsupported by the evidence. Johnson claims the Board erred in calculating Copeland's work disability based on a finding of 60% task loss and 100% wage loss.

Again, we review the record to see if it supports the findings entered by the Board. "In a workers compensation case, the finder of fact's determinations should be affirmed if they are supported by substantial competent evidence." *Foulk v. Colonial Terrace*, 20 Kan. App. 2d at 285.

K.S.A. 44-510e(a) sets out the statutory definition of permanent partial general disability and an injured employee's entitlement to the same:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, *in the opinion of the physician*, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury." (Emphasis added.)

Johnson does not contest the Board's finding that "[t]he only testimony as to claimant's percentage of task loss, in the 'opinion of the physician' comes from Dr. Shechter." Rather, Johnson argues the Board erroneously disregarded Gammon's testimony that

Copeland's task loss ranged from 1.5% to 23.5% depending on either Dr. Shechter's or Dr. Storm's restrictions. Johnson insists the extent of permanent partial general disability should be made by a vocational rehabilitation expert who takes a comprehensive inventory of the employee's prior job tasks and evaluates the claimant's continued ability to perform those tasks based on the physician's restrictions. Johnson provides no supporting authority for this argument.

Along these same lines, Johnson argues Dr. Shechter's testimony is not credible since he has no experience in vocational rehabilitation or finding employment for injured persons. Johnson also points out that Dr. Shechter never observed Copeland's work activities at her prior jobs, did not interview her regarding her past duties, and did not review all of her job tasks in the previous 15 years. Johnson argues Dr. Shechter's testimony is highly questionable since he did not arrive at the 60% loss of job task figure until he met with Copeland's attorney immediately prior to his deposition.

The 1993 amendments to 44-510e(a) express a clear intent by the legislature to have the *physician* render the opinion as to the loss of ability to perform work tasks that were performed by the employee in the previous 15 years of employment. Before 1993, it was necessary for a claimant to have expert testimony concerning the percentage by which "the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced." K.S.A. 1992 Supp. 44-510e(a); see *Foulk*, 20 Kan. App. 2d at 280-81; *Scharfe v. Kansas State Univ.*, 18 Kan. App. 2d 103, 105, 848 P.2d 994, *rev. denied* 252 Kan. 1093 (1992). The two pre-1993 elements were replaced with the elements of a physician's testimony on the loss of the employee's ability to perform the tasks he or she performed in the previous 15 years of employment, averaged with the difference between pre- and post-injury average weekly wage.

It appears the need for a vocational rehabilitation expert has vanished. Pursuant to 44-510e(a), the claimant's loss of the ability to perform tasks in the claimant's employment history must come

from a physician. As a result, the Board did not err in calculating a 60% loss of this ability based on Dr. Shechter's testimony.

Finally, Johnson argues the Board erred in calculating Copeland's work disability based on a finding of 100% wage loss. Johnson's argument is based on the theory that Copeland still has the ability to earn wages, as testified to by *all* the experts. Gammon testified Copeland had either 0% or 12.5% loss of wage earning capacity. Santer testified Copeland had a 26% loss of wage earning capacity and opined she could be expected to earn $5 per hour post-accident. None of the doctors or experts testified that Copeland would be unable to return to work.

Johnson concedes the specific language of the current 44-510e(a) appears to speak only in terms of the actual difference between pre- and post-injury average weekly wage. Johnson argues the legislature certainly did not intend for an injured worker to receive workers compensation benefits based on the *actual* post-injury wages without regard to the worker's *capacity* to earn wages following the accident. Johnson contends claimants will not seek employment within their capabilities in order to maximize their recovery for permanent partial disability.

Copeland argues that "capacity to earn wages" may have been a factor under the pre-1993 version of 44-510e(a), but it is not a stated factor under the current version of this statute. Copeland argues that the Board followed the procedures of 44-510e(a) and correctly arrived at a 100% loss of wages.

The court in *Foulk,* 20 Kan. App. 2d 277, Syl. ¶ 4, stated it would be unreasonable for the courts to conclude the legislature intended to encourage workers to merely sit at home, refuse to work, and take advantage of the workers compensation system. The high-lighted fact in *Foulk* was that the employer proffered a job within the worker's ability and the worker refused to even attempt the job. As discussed in the first issue, those facts are not currently before this court. Although *Foulk* dealt with a pre-1993 version of 44-510e(a), the general principles established in *Foulk* would presumably apply to a case falling under the current version of 44-510e(a).

In attempting to harmonize the language of K.S.A. 44-510e(a) with the principles of *Foulk*, we find the factfinder must first make a finding of whether a claimant has made a good faith effort to find appropriate employment. If such a finding is made, the difference in pre- and post-injury wages based on the actual wages can be made. This may lead to a finding of lesser wages, perhaps even zero wages, notwithstanding expert opinion to the contrary.

If a finding is made that a good faith effort has not been made, the factfinder will have to determine an appropriate post-injury wage based on all the evidence before it, including expert testimony concerning the capacity to earn wages. Since no such determination was made here, we reverse and remand on that issue also.

Reversed and remanded for further proceedings.