(979 P.2d 1256)
No. 81,018

BRENDA SWICKARD, *Appellant*, v. MEADOWBROOK MANOR and ZURICH-AMERICAN INSURANCE CO., *Appellees*.

Opinion filed May 7, 1999.

*Paul D. Leader*, Affiliated Attorneys of Pistotnik Law Offices, of Wichita, for the appellant.

*Douglas M. Greenwald*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for the appellees.

Before LEWIS, P.J., PIERRON, J., and CHARLES E. WORDEN, District Judge, assigned.

PIERRON, J.: Brenda Swickard appeals the decision of the Workers Compensation Appeals Board (Board) affirming the decision of the administrative law judge (ALJ) to limit her permanent partial disability benefits to her functional impairment rating. Swickard claims the Board erred in concluding she was not entitled to an award based on work disability. We affirm.

In November 1994, Swickard began working as a certified nurses' aide at Meadowbrook Manor (Meadowbrook) earning $7.40 per hour. Due to difficulty in finding transportation, she was unable to work the first day shift. She made an arrangement with the director of nursing that allowed her to work the second shift and arrive approximately an hour later than other employees.

In March 1995, Swickard injured her back while transferring a resident from a recliner to a wheelchair. Swickard continued to work for several days after the accident and received treatment from Dr. LyGrisse and Dr. Sparks as authorized by Meadowbrook. She also sought treatment from Dr. Scharenberg, her personal chiropractor.

Dr. LyGrisse and Dr. Sparks released Swickard to return to work under a light-duty restriction. Dr. Scharenberg recommended Swickard take a week off work. Approximately one week after the accident, Swickard informed Meadowbrook's administrator, William Fisher, of Dr. Scharenberg's advice and was given permission to take the time off. Swickard returned to Meadowbrook a week later and discovered her name had been removed from the second-shift work schedule.

Fisher and the director of nursing informed Swickard that Meadowbrook could accommodate her medical restrictions if she worked a modified duty during the first shift. Jeanie Montgomery, the administrator of Meadowbrook, testified it was Meadowbrook's policy to offer injured employees work on the first shift because more workers were scheduled, allowing an injured employee to work within his or her restrictions. Montgomery also testified injured employees worked the second shift only if an appropriate position was available. She testified an appropriate position had not been available for Swickard since she was hired as administrator in October 1995.

Swickard did not accept the offer because of her transportation problems. She testified she and her husband worked in cities other than where they resided and had only one car. She stated that because of her husband's work schedule, she could not get to Meadowbrook during the first shift.

On April 17, 1995, Meadowbrook sent a letter renewing its offer to work the modified duty during the first shift and indicated the offer was continuing. Swickard again turned down the offer and, in May, filed an application for a hearing with the Division of Workers Compensation.

Swickard's back pain worsened and Dr. Sparks referred her to Dr. Amrani, an orthopedic surgeon. Dr. Amrani recommended

surgery. Zurich Insurance Company (Zurich) did not authorize Dr. Amrani and referred her to Dr. Stein, a neurosurgeon. Dr. Stein believed surgery was not necessary and recommended physical therapy and epidurals. In September 1995, Zurich sent Swickard to Dr. Munhall, a physical rehabilitation expert, who released her in November to return to light-medium capacity work.

In December 1995, a preliminary hearing was held to determine a dispute over the authorization of medical treatment, the payment of outstanding medical bills, and temporary total disability benefits. The ALJ ordered Swickard to be examined by an independent physician. Dr. Brown, an orthopedic surgeon, conducted the examination and later became authorized to treat her condition. In April, Dr. Brown released her to return to work concluding she had reached her maximum improvement. He stated she did not require restrictions on bending or twisting activities, but was restricted from lifting 60 pounds occasionally and lifting 30 pounds frequently.

Meadowbrook sent a letter to Dr. Brown, along with a description of the duties of a nurses' aide assigned to modified duty, asking him to designate which duties Swickard was capable of performing. Dr. Brown indicated Swickard was capable of performing all the duties listed. In May 1996, Meadowbrook telephoned Swickard and sent her a letter offering a modified work assignment at $7.40 per hour on the first shift until she was able to return to normal duties. Swickard again turned down the offer explaining her transportation problem. Montgomery testified Swickard stated she could not work first shift because the engine in the car had blown up.

Swickard went to Dr. Zimmerman, a medical consultant for the Social Security Administration, for an evaluation in preparation for the hearing. Dr. Zimmerman concluded Swickard had a 12% impairment rating as a result of the accident. He also recommended that Swickard be permanently restricted from lifting 20 pounds occasionally, 10 pounds frequently, and from bending and stooping activities.

The regular hearing was held in April 1997. The parties stipulated that Swickard's accident occurred out of and in the course of

employment and that she had a 9% impairment rating to the body as a whole. Swickard testified she had not worked for any other employer since leaving Meadowbrook. She stated she applied for unemployment in March 1995 and told the unemployment personnel she was willing and able to work. Swickard testified she performed house cleaning and babysitting duties for her sister and applied with 4 separate employers since Dr. Brown released her but had not found employment. She also stated she requested employment during the second shift at Meadowbrook 3 or 4 times and looked for work in the paper every week.

The ALJ issued an award in September 1997, finding Swickard failed to attempt to perform the accommodated work offered by Meadowbrook and limited her recovery of benefits to her 9% functional impairment rating. Swickard appealed to the Board. The Board affirmed the award entered by the ALJ. Swickard appeals the Board's decision.

Swickard argues the Board's failure to enter an award for work disability is contrary to the uncontroverted evidence. Swickard claims Meadowbrook's offer of accommodated employment on the first shift was not reasonable because Meadowbrook knew she only had transportation to work during the second shift. She argues she did not refuse the accommodated position, rather she was not capable of accepting it due to her transportation problem.

Meadowbrook and Zurich (respondents) contend the Board properly applied the presumption of no work disability because Swickard refused accommodated employment at a comparable wage. They argue the presumption applied because Swickard's reason for refusing the accommodated position was unrelated to her physical impairments. Respondents claim Meadowbrook was not required to accommodate her transportation problem and she had not lost the capacity to earn comparable wages. They also contend Swickard's failure to make an attempt to return to work and failure to obtain post-injury work demonstrate an attempt to take advantage of the workers compensation system.

The ALJ indicated the main issue in the case was whether Meadowbrook was required to offer accommodated work on a specific shift. The ALJ found Meadowbrook extended an offer of employ-

ment within Swickard's medical restrictions at a comparable wage. The ALJ concluded Meadowbrook was not required to accommodate Swickard's transportation problem and her failure to attempt the accommodated work implicated the principles set forth in *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995).

In its final order, the Board stated it adopted the ALJ's findings of fact and conclusions of law. It agreed Swickard's refusal to accept an accommodated position invoked the *Foulk* principles. One Board member dissented, concluding the *Foulk* decision did not apply because Swickard was justified in declining the first shift position due to transportation problems and the evidence did not establish Swickard was attempting to take advantage of the system.

The Board's findings of fact will be upheld if those findings are supported by substantial competent evidence. *Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d 306, 317, 944 P.2d 179 (1997). On appeal, questions of law pertaining to workers compensation are subject to unlimited review. *Brigham v. Dillon Companies, Inc.*, 22 Kan. App. 2d 717, 718, 921 P.2d 837 (1996), *rev. on other grounds* 262 Kan. 12, 935 P.2d 1054 (1997).

K.S.A. 44-510e(a) governs the award of permanent partial general disability benefits. Prior to 1993, this statute set forth a presumption against disability benefits if an employee engaged in work for wages comparable to the gross weekly wage earned by the employee at the time of the injury. See *Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d at 312. Although the language in the applicable version of the statute has changed, the law surrounding the presumption has not. See *Lowmaster v. Modine Mfg. Co.*, 25 Kan. App. 2d 215, 217, 962 P.2d 1100 (1998).

In *Foulk*, this court considered whether the presumption of no work disability applied to cases where the worker has the ability to engage in work at a comparable wage but does not do so. This court recently discussed the *Foulk* decision in *Lowmaster v. Modine Mfg. Co.*:

"In *Foulk v. Colonial Terrace*, an employee refused an employer's offer of accommodated employment and then claimed that she was entitled to work disability. 20 Kan. App. 2d at 280. The employee argued that the presumption of no work

disability does not apply if a worker has the *ability* to engage in such work but *chooses* not to do so. 20 Kan. App. 2d at 283.

"This court found that to construe K.S.A. 44-510e(a) in this manner would be unreasonable where the proffered job is within the worker's ability and the worker has refused to even attempt the job. 20 Kan. App. 2d at 284. Further, this court found that the legislature clearly did not intend for a worker to receive compensation where the worker is capable of earning nearly the same wage as his or her pre-injury wage. 20 Kan. App. 2d at 284. More importantly, this court stated that 'it would be unreasonable . . . to conclude that the legislature intended to encourage workers to merely sit at home, refuse to work, and take advantage of the workers compensation system.' 20 Kan. App. 2d at 284." 25 Kan. App. 2d at 217.

In *Copeland v. Johnson Group, Inc.*, this court expanded the *Foulk* decision stating:

"In attempting to harmonize the language of K.S.A. 44-510e(a) with the principles of *Foulk*, we find the factfinder must first make a finding of whether a claimant has made a good faith effort to find appropriate employment. If such a finding is made, the difference in pre- and post-injury wages based on the actual wages can be made. This may lead to a finding of lesser wages, perhaps even zero wages, notwithstanding expert opinion to the contrary.

"If a finding is made that a good faith effort has not been made, the factfinder will have to determine an appropriate post-injury wage based on all the evidence before it, including expert testimony concerning the capacity to earn wages." 24 Kan. App. 2d at 320.

In *Cooper v. Mid-America Dairymen*, 25 Kan. App. 2d 78, 82, 957 P.2d 1120, *rev. denied* 265 Kan. 884 (1998), this court stated that under *Foulk* and *Copeland*, where a claimant has the ability to earn wages but is not doing so, an inquiry must be made in the good faith of the claimant in seeking employment. "An effort that amounts to nothing more than a sham or token effort will not suffice." 25 Kan. App. 2d at 82.

Evidence in the record indicates Meadowbrook offered Swickard employment at a comparable wage within her restrictions during a different shift. The testimony of Dr. Brown indicated Swickard was capable of performing all the duties required by the accommodated position. The testimony of other physicians also indicated Swickard was capable of returning to work under certain restrictions. Evidence in the record also indicates Swickard made some efforts to find a job after her injury but failed to do so.

Neither the Board nor the ALJ determined whether Swickard's efforts in returning to Meadowbrook or finding new employment were made in good faith. Nevertheless, Swickard had the burden to overcome the presumption that she had no work disability. Swickard explained her transportation problem was due to the fact she and her husband only had one vehicle. Swickard refused to accept the accommodated employment, making no attempt to do the work. The Board, therefore, could properly conclude the policy considerations outlined in *Foulk* applied.

"Whether framed in terms of the 'good faith' test articulated in *Copeland*, or the policy considerations outlined in *Foulk*, the result is the same. An employee who is capable of accommodated work must, at a minimum, attempt to do such work. A mere refusal to do the work is insufficient to allow the employee to circumvent the provisions of K.S.A. 44-510e(a)." *Lowmaster*, 25 Kan. App. 2d at 219.

Evidence indicating Meadowbrook's offer was unreasonable or made in bad faith is not uncontroverted as Swickard suggests. Montgomery testified it was Meadowbrook's policy to offer injured employees a position on the first shift. She also stated injured employees worked the second shift, but only if an appropriate position was available. Further, Meadowbrook offered the accommodated work on several occasions.

The ALJ concluded Swickard failed to meet her burden to prove Meadowbrook's offer of accommodated work was unreasonable or not made in good faith. "This court may not reweigh the evidence presented at the agency hearing or determine the weight and credibility of the witnesses' testimony." *Copeland*, 24 Kan. App. 2d at 316-17.

Swickard's reason for not taking the proffered accommodated position was her transportation problem, which had nothing to do with her physical ability to perform the work. Although the employer was required to offer reasonable accommodations to deal with her physical problems, it was not required to make unusual efforts to accommodate her transportation problems.

Affirmed.