(998 P.2d 514)
No. 83,095

GEORGE SURLS, *Appellee,* v. Saginaw Quarries, Inc., and LIBERTY MUTUAL INSURANCE COMPANY, *Appellants,* and NEOSHO CONSTRUCTION COMPANY, INC., and ST. PAUL FIRE AND MARINE INSURANCE COMPANY, *Appellees.*

Opinion filed February 18, 2000.

*Maureen T. Shine,* of Law Offices of Stephanie Warmund, of Overland Park, for the appellants.

*Kristine A. Purvis,* of Hanson & Gurney, of Overland Park, for the appellees Neosho Construction Company, Inc., and St. Paul Fire and Marine Insurance Company.

*Keith L. Mark,* of Mark & Burkhead Law Offices, of Mission, for the appellee George Surls.

Before BRAZIL, C.J., PIERRON, J., and WAHL, S.J.

PIERRON, J.: Saginaw Quarries, Inc., and Liberty Mutual Insurance Company, (collectively Saginaw) appeal the allocation of a workers compensation award in favor of George Surls. The Workers Compensation Board (Board) found Saginaw was responsible to Surls for 8.75% functional impairment and 83.5% permanent partial general disability. The Board found Neosho Construction and St. Paul Fire & Marine Insurance Company, (collectively Neosho) were responsible to Surls for an award of an additional 3% functional impairment. Saginaw (Surls' employer during the first injury) argues that Neosho (Surls' employer during the second injury) should be responsible for the 83.5% permanent partial general disability award. Both Saginaw and Neosho also argue the administrative law judge (ALJ) and the Board erred in denying a

request for an extension of terminal dates in order to allow evidence regarding a job offer extended to Surls. We affirm.

On January 19, 1996, while working as a heavy equipment operator for Saginaw, Surls injured his neck, back, shoulder, arm, and leg when he fell while getting out of a dump truck. Surls was off work for approximately 3 weeks, received treatment and work restrictions from Dr. David Clymer, and then returned to the same job. Saginaw provided work for Surls within the restrictions.

Surls was examined by Dr. Edward J. Prostic on April 18, 1996. Dr. Prostic told Surls not to lift greater than 50 pounds on a single lift, or greater than 20 pounds on a repetitive basis and limit work above eye level. Surls testified that Dr. Prostic recommended restrictions similar to those of Dr. Clymer.

Surls returned to work for Saginaw for approximately 2 months and then was transferred to work for Neosho where he again worked as a heavy equipment operator. Surls testified that Neosho owned Saginaw and that he dealt with the same people at both jobs. Neosho originally provided work within the restrictions set by Dr. Clymer and Dr. Prostic.

On May 17, 1996, while working for Neosho, Surls reinjured the same parts of his body he had injured in the January accident at Saginaw. In the Neosho injury, Surls was lifting a 100-pound ramp, which violated his work restrictions. Surls testified that Neosho sent him out alone to do the job. After that accident, Surls again received medical treatment and was off work for 6 months. He was treated by Dr. Melvin Karges.

Dr. Karges released Surls with the same work restrictions as recommended by Dr. Clymer and Dr. Prostic. Surls testified that he tried to return to work for either Neosho or Saginaw, but they both refused to reemploy him. Surls stated they told him he needed to be 100% in order to come back to work.

Surls attempted to obtain employment from various employers but was unsuccessful in his job search due to his work restrictions. Surls has not worked since his injury at Neosho. He saw Dr. Prostic again after the Neosho injury. Dr. Prostic testified that as a result of the second accident, Surls had additional functional impairment, but Dr. Prostic did not recommend a change in the work restric-

tions. Dr. Prostic reviewed a list of the work tasks Surls had performed during the past 15 years and concluded Surls was unable to perform 67% of those tasks.

Surls filed applications for hearings concerning the January 19, 1996, accident at Saginaw and the May 17, 1996, accident at Neosho. The cases were consolidated by agreement of the parties.

Following the hearing, the ALJ entered an award for Surls where he received benefits based on an 8.75% functional impairment against Saginaw for the first accident and benefits for a 74.75% work disability against Neosho for the second accident. Neosho appealed the decision to the Board claiming that Neosho should only be responsible for any additional functional impairment because Surls' work restrictions did not change after the second accident. Neosho also claimed the ALJ erred in refusing to extend the terminal dates to allow evidence of a subsequent job offer to Surls.

The Board affirmed the ALJ's decision not to extend the terminal date, finding that Neosho and Saginaw did not demonstrate good cause for an extension. However, on the issues surrounding the injury award, the Board reversed the ALJ's decision and assessed 8.75% functional impairment and 83.5% work disability against Saginaw, and a 3% functional impairment against Neosho since Surls suffered no additional work restrictions following the accident at Neosho.

Saginaw argues the Board erred in holding it should be responsible for Surls' permanent partial general disability because Neosho created Surls' work disability.

Appellate review of agency actions is limited to questions of law under the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq*. See *Gleason v. Samaritan Home*, 260 Kan. 970, 976, 926 P.2d 1349 (1996). The court's interpretation of a statute is a question of law over which appellate review is unlimited. See *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

Kansas law provides for a rebuttable presumption of no work disability where the employee after his or her work-related injury is able to engage in any work for wages equal to 90% or more the

average gross weekly wage that the employee was earning at the time of the injury. See K.S.A. 1999 Supp. 44-510e(a).

This court analyzed 44-510e(a) in *Lee v. Boeing Co.*, 21 Kan. App. 2d 365, 899 P.2d 516 (1995). Lee was injured and missed approximately 7 months of work. He returned and performed accommodated duties until he was laid off 16 months later for economic reasons. The court found that, under the plain language of the statute, a claimant may be entitled to a work disability if he or she stops earning 90 % of their average gross weekly wage. 21 Kan. App. 2d at 371.

The *Lee* decision was clarified by *Watkins v. Food Barn Stores, Inc.*, 23 Kan. App. 2d 837, 936 P.2d 294 (1997). Watkins was injured but returned to work and performed the same work for the same wage. Watkins lost his job when the store was sold. This court found that Watkins was not entitled to a work disability rating. 23 Kan. App. 2d at 839-40. The court explained that placing an injured worker in an accommodated job artificially avoids work disability by allowing the employee to retain the ability to perform work for a comparable wage. Once an accommodated job ends, the presumption of no work disability may be rebutted. 23 Kan. App. 2d at 838-39. The *Watkins* court held:

"If following an injury an employee is physically able to return to work, perform his or her job duties without special accommodation, and earn a wage comparable to his or her pre-injury wage, then by definition that employee does not have work disability. See K.S.A. 1992 Supp. 44-510e(a). If the employee subsequently loses the job for economic or other reasons, the loss of employment cannot by itself create a work disability, absent a change in the employee's physical condition." 23 Kan. App. 2d at 839.

The claimants in both *Lee* and *Watkins* lost their jobs due to economic circumstances. Here, we are dealing with a similar loss of employment due to no fault of the employee but not due to economic reasons. *Cf. Perez v. IBP, Inc.*, 16 Kan. App. 2d 277, 826 P.2d 520 (1991) (employee fired for cause not entitled to a work disability rating where employee returned to the same work for the same wage); *Niesz v. Bill's Dollar Store*, 26 Kan. App. 2d 737, 993 P.2d 1246 (1999) (accommodated employee fired for poor cus-

tomer service and complaints, but there was no investigation into the validity of the complaints; work disability permitted).

This case involves two employers, two insurance carriers, and two injuries consolidated in one case on appeal. Although there is an apparent relationship between Neosho and Saginaw, it is of no consequence since each company was insured by a different insurance company. The question for our resolution is whether the employee's old or new employer (and carrier) is responsible for the work disability.

Saginaw argues it followed the public policy mandates of the Workers Compensation Act by reemploying Surls in his job at Saginaw at the same pre-injury wage after he was released with work restrictions following the January 19, 1996, injury. Saginaw argues the only reason Surls was unable to return to work after the May 17, 1996, injury was because Neosho would not take him back to work in his accommodated position. Saginaw argues the event which makes Surls' disability a work disability is the second injury on May 17, 1996. Saginaw suggests the Board is punishing Saginaw for honoring Surls' work restrictions in an accommodated position and rewarding Neosho, which ignored Surls' restrictions and then would not give him an accommodated job following his injury.

However, we do note that Saginaw similarly refused to reemploy Surls after the second accident for the same reasons as Neosho.

Saginaw also argues Neosho is responsible for the work disability because Surls was working outside his work restrictions when he was injured on May 17, 1996. Neosho responds that the record contains no evidence that it directed Surls to work outside his restrictions.

Neosho, for the most part, bases its argument on the fact that no additional work restrictions resulted from the second injury. Dr. Prostic testified that all of Surls' work disability resulted from the injury at Saginaw. Neosho argues there is no reason Surls could not perform the same job he was doing before his injury at Neosho.

There are several public policies at work in this case. Kansas courts have held it is unreasonable to conclude the legislature intended to encourage workers to sit at home, refuse to work, and take advantage of the workers compensation system. *Copeland v.*

*Johnson Group, Inc.*, 24 Kan. App. 2d 306, Syl. ¶ 6, 944 P.2d 179 (1997). Placing an injured worker in an accommodated job avoids a work disability by allowing the employee to retain the ability to perform work for a comparable wage. See K.S.A. 1999 Supp. 44-510e(a). In this way, an accommodated job can be beneficial to both the employee and the employer. See *Griffin v. Dodge City Cooperative Exchange*, 23 Kan. App. 2d 139, 147-48, 927 P.2d 958 (1996), *rev. denied* 261 Kan. 1084 (1997).

Likewise, an employer who accommodates an injured employee, especially if the accommodated position pays comparable wages, can benefit under the Workers Compensation Act. This benefit arises not only by retaining an experienced employee, but also by the potential that the employer's liability for workers compensation benefits can be reduced. For example, an employee placed in an accommodated position with a comparable wage must overcome the statutory presumption that he or she has no work disability under K.S.A. 1999 Supp. 44-510e(a) and would generally be limited to benefits based upon his or her functional disability. See, *e.g.*, *Lee*, 21 Kan. App. at 372; *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 284, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995); *Elliff v. Derr Constr. Co.*, 19 Kan. App. 2d 509, 513, 875 P.2d 983 (1993).

In cases where a business changes insurance companies between an employee's first injury and second injury, the Kansas courts have applied the "last injurious exposure" rule. Under this rule, liability is assigned "to the carrier covering the risk at the time of the most recent injury that bears a causal relation to the original disability. If an employee sustains a subsequent injury which is found to be a new injury, the insurer at risk at the time of the second injury is liable for all of the claimant's benefits." *Helms v. Tollie Freightways, Inc.*, 20 Kan. App. 2d 548, Syl. ¶ 3, 889 P.2d 1151 (1995). The ALJ in the case at bar applied the "last injurious exposure" rule to find Neosho liable for the entire award. The ALJ reasoned that Surls' work restrictions may not have changed, but his work disability was acquired following the May 17, 1996, accident because Neosho refused to continue his accommodated employment.

Dr. Prostic, the only physician who testified, examined Surls after both the January 19, 1996, accident and the May 17, 1996, accident. He testified that Surls' work restrictions did not change after the May 17, 1996, accident. However, Dr. Prostic did find Surls had an additional 5% functional impairment as a result of the second accident. The parties eventually stipulated that Surls sustained an additional 3% functional impairment following the May 17, 1996, accident. Dr. Prostic also specifically testified that all of the 67% loss of Surls' task performing ability was due to the January 19, 1996, accident.

While Neosho would certainly be responsible had there been only its accident, we believe the crucial facts here are that the first (Saginaw) injury essentially set the level of disability and Saginaw declined to reemploy Surls when his Neosho job was no longer available.

Saginaw can claim the protections of the statute as long as Surls has employment that provides him with the level of income required by the statutes. If another employer is not willing to provide such a job, Saginaw can either provide the job itself or incur the liability of the increased work disability rating.

While the intervening accident did increase Surls functional disability, which was assessed against Neosho, it did not increase his work disability. Under these somewhat unusual facts, Saginaw cannot complain that it has been unfairly treated just because Neosho refused to continue to provide accommodated employment.

Saginaw is essentially in the same position as if Neosho had not intervened. Had there been some significant increase in work restrictions caused by the second accident, we might have a different result.

Next, Saginaw argues and Neosho agrees that the ALJ erred in denying their requests for an extension of their terminal date in order to allow evidence regarding a job offer extended to Surls.

K.S.A. 1999 Supp. 44-523(b) provides that the terminal dates set by the ALJ can be extended by agreement of the parties or may be granted (1) if the employee is receiving temporary or permanent total disability compensation; (2) in certain situations for a medical examination of the claimant; or (3) for good cause shown.

The granting of an extension of the terminal dates for good cause shown carries a discretionary review similar to the court's granting or denying a motion for a continuance. The ruling on a motion for continuance is discretionary with the trial court, and an order denying a motion for continuance will not be disturbed on appeal unless there is a clear showing of an abuse of discretion. An abuse of discretion for failure to grant a continuance exists only when no reasonable person would take the view adopted by the trial court. See *Mansfield Painting & Decorating, Inc. v. Budlaw Services, Inc.*, 3 Kan. App. 2d 77, 82, 589 P.2d 643, *rev. denied* 225 Kan. 844 (1979); See also *State v. McDonald*, 250 Kan. 73, 80, 824 P.2d 941 (1992) (discretionary review of failure to grant continuance in criminal case for good cause under K.S.A. 22-3401); *In re Marriage of Zodrow*, 240 Kan. 65, Syl. ¶ 2, 727 P.2d 435 (1986) (discretionary review of ruling on good cause to set aside default judgment).

Terminal dates were originally set in this case as June 30, 1997, for Surls and July 30, 1997, for Neosho and Saginaw. Due to the difficulty in scheduling Dr. Prostic's deposition, the parties agreed to an initial extension to August 18, 1997, for Surls and September 18, 1997, for Neosho and Saginaw. Surls completed his case by August 18, 1997, and the parties then agreed to a second and third extension resulting in a terminal date of November 18, 1997, for Neosho and Saginaw. Neosho and Saginaw did not take any additional evidence before November 18, 1997, and then on December 31, 1997, Neosho asked for an additional extension. Saginaw asked for an extension on January 5, 1998. The reason for the request was to put on evidence of a job offer given to Surls. Surls stated the job offer discussions began in late October 1997 and the offers were for jobs in Fall City, Nebraska; St. Joseph, Missouri; and Marshall, Missouri.

The ALJ held that at the time Neosho and Saginaw made their respective motions to extend the terminal date on December 31 and January 5, the latest terminal date had expired and the terminal date had already been twice previously extended. We find the ALJ did not abuse his discretion in refusing to extend the terminal date, although an extension could have been granted.

Affirmed.