(101 P.3d 239)
No. 91,485

MICHAEL S. JORDAN, *Appellee,* v. PYLE, INC., and CONTINENTAL
WESTERN INSURANCE CO., *Appellants.*

Opinion filed November 19, 2004.

*Nathan D. Burghart* and *Mark A. Buck*, of Fairchild & Buck, P.A., of Topeka, for appellants.

*David H. Farris*, of Hammond, Zongker & Farris, L.L.C., of Wichita, for appellee.

Before GREEN, P.J., MCANANY, J., and BUKATY, S.J.

GREEN, J.: Pyle, Inc. (Pyle), and its insurance carrier, Continental Western Insurance Co., appeal the decision of the Workers Compensation Board (Board) awarding disability benefits to Michael Jordan. First, Pyle argues that the Board erred in finding that Jordan's injuries which resulted from a fight between him and a coworker arose out of and in the course of employment. Because there was substantial competent evidence to support the Board's finding that Pyle had reason to anticipate the assault, we find that Jordan's injury was compensable. Moreover, the evidence reveals that Jordan's injuries arose out of the nature and conditions of his employment with Pyle. Although Pyle alleges that Jordan started the fight by throwing the first punch, a determination of who initiated the fight is irrelevant as to whether workers compensation benefits should be awarded in this case.

Next, Pyle contends that the Board should have awarded disability benefits to Jordan based on his functional impairment rating instead of his work disability rating. We disagree and find that there was substantial competent evidence to support the Board's decision that Jordan suffered a work disability.

Next, Pyle argues that the Board erroneously included within the computation of Jordan's average weekly wage a $15 per day payment for meals. Because this payment constituted additional compensation that resulted in economic gain to Jordan, we find that the Board properly included this payment within Jordan's average weekly wage. Finally, Pyle contends that Jordan's work disability should be reduced by the amount of task loss that Jordan suffered from a prior injury. We find that there was substantial competent evidence to support the Board's decision not to consider task restrictions that were previously placed on Jordan by one examining doctor in 1996. Accordingly, we affirm the Board's decision.

The events in this case stem from two altercations that occurred during the morning of February 23, 2000, between Jordan and John Gagnebin. On that date, both Jordan and Gagnebin were employed by Pyle and were assigned to a construction project in

Woodward, Oklahoma. The fights between Jordan and Gagnebin occurred in a small building which was next to the church being constructed by Pyle. Both Terry Jarvis and foreman Tim Decker witnessed the fights.

The altercations occurred after Gagnebin confronted Jordan about a $2 microwave rental fee that was owed to the hotel manager. Jordan and Gagnebin had been placed in a room together at a local hotel in Woodward for which Pyle was paying the lodging expenses. Pyle employees were also given a $15 per day payment separate from their paycheck to be used for food expenses. While staying at the hotel, Jordan and Gagnebin rented a microwave from the hotel. The microwave expense was not covered by Pyle and was paid by the individual employees.

On the morning of February 23, Jordan was already in the break room of the building when Gagnebin came inside. The details concerning the altercations varied in the testimonies given by Jordan, Jarvis, and Decker. According to Jordan, he had already clocked in for work when Gagnebin entered the break room and confronted him about the microwave rental fee. Jordan indicated that Gagnebin was yelling and threatening him with violence. Jordan further indicated that Gagnebin pushed him, and they both began swinging at each other. Jordan testified that he hit Gagnebin first.

According to Decker, Gagnebin was "harassing" Jordan about paying the hotel manager the microwave rental fee. Jordan told Gagnebin that he needed to stay out of his business, but Gagnebin kept "pestering him about it." When Jordan told Gagnebin to drop the matter, Gagnebin became more irritated and asked if Jordan "wanted a piece of him." At that point, Jordan stood up so that he and Gagnebin were face to face. Decker testified that Jordan hit Gagnebin and Gagnebin fell to the floor.

According to Jarvis, when Gagnebin came inside the break room, he was trying to relay the message from the hotel manager about the microwave rental fee. The two men began yelling back and forth. Jarvis indicated that Jordan was more aggressive than Gagnebin. Jarvis did not know whether Jordan or Gagnebin swung first, but he saw the two men rolling around on the floor.

Jordan ended up on top of Gagnebin on the floor. Decker ordered Jordan to get off of Gagnebin, and he and Jarvis separated the two men. Decker told Jordan to go to the job site. As Jordan was leaving the building, Gagnebin went after him and stabbed him in the head and neck. Jordan fell back onto a table in the other room.

On the day of the fights, Jordan received medical treatment for the stabbing at the Woodward Hospital Emergency Room. At that time, Jordan complained of swelling in his left thumb and a laceration to the left side of his head. Jordan did not complain of a back injury at that time, and the medical reports indicate that no back examination was performed. The treating physician released Jordan to return to work on that same day. Jordan indicated that after returning home, he noticed a bruise on his back and experienced back pain.

The day after the fights, Jordan received a certified letter informing him that he was fired from Pyle. According to Decker, Pyle has a "no tolerance" policy towards fighting, meaning that if an individual fights, he or she is fired. Decker was unaware of any written Pyle policy concerning fighting. Although there had been a fight a couple of years before that time, Jordan was not working for Pyle then.

Since the accident, Jordan has not been employed other than working for a friend for about 10 days earning approximately $12 an hour. Jordan indicated that he has made phone calls, talked to people in person, and filled out applications trying to obtain employment. At the hearing before the ALJ, Jordan presented a list of employers that he had contacted since July 6, 2001.

At the hearing before the administrative law judge (ALJ), Jordan indicated that he and Gagnebin had been involved in a long-standing dispute. Jordan testified that he had told Decker, David Pyle, who was the owner of Pyle, and the area foreman that they were not getting along; that Gagnebin was threatening him with fighting; and that he wanted his own room. Jordan indicated that he had his own room at one time, but in Woodward he was placed back with Gagnebin.

Decker, however, denied knowing about any long-standing problems between Jordan and Gagnebin until the morning of February 23, 2000. Nevertheless, Decker knew that Jordan and Gagnebin did not like each other. On the other hand, Jarvis indicated that he was aware of a dispute that had been going on at least 2 or 3 weeks before the fights between Jordan and Gagnebin. Jarvis testified that David Pyle, the acting superintendent, was also aware of the dispute.

The first time that Jordan sought medical treatment for his back injury was in June 2000 when he saw Dr. Jane Drazek. At the June visit, Dr. Drazek diagnosed Nelson with low back pain with radiation into the lower extremity with possible radiculopathy. Although Jordan wrote on his patient information sheet that the date of accident was March 12, 2000, Jordan testified that his back was hurting previous to that date and he must have written the wrong date.

Dr. Drazek released Jordan from her care in July 2001, indicating that he had most likely reached a point of maximum medical improvement. Dr. Drazek imposed permanent work restrictions. Dr. Drazek's opinion was that Jordan had suffered a 10% whole body functional impairment.

Jordan was also examined by Dr. Phillip Mills and Dr. Pedro Murati. Dr. Murati diagnosed Jordan with low back pain secondary to radiculopathy and imposed permanent work restrictions. Dr. Murati's expert opinion was that Jordan suffered a 20 percent whole body functional impairment. Dr. Mills diagnosed Jordan with bulging discopathy with underlying degenerative disc disease. Dr. Mills' opinion was that Jordan suffered a 5 percent whole body functional impairment. All three doctors indicated that Jordan's symptoms were caused by his February 23, 2000, injury.

Jordan was seen separately by Jerry Hardin and Karen Terrill, who prepared a list of tasks that Jordan performed in his previous employment. Utilizing the work restrictions from Dr. Murati and Dr. Drazek, Hardin indicated that Jordan could expect to earn a full-time wage of $7 an hour. Terrill reviewed the restrictions imposed by Dr. Mills and Dr. Murati and determined that Jordan could earn between $8 and $9 an hour.

Dr. Murati and Dr. Drazek compared their restrictions with the task list compiled by Hardin. Both doctors' opinions were that Jordan had a 97 percent task loss. Dr. Mills agreed with Terrill's analysis that based on his work restrictions, Jordan's injuries resulted in a 28 percent task loss. Terrill's report took into account the pre-existing work restrictions that were issued by Dr. Daniel Zimmerman in a previous workers compensation injury. Hardin's report did not take into account the restrictions imposed for Jordan's previous injuries.

Jordan's previous injury occurred in 1996 when he fractured his right wrist and hip after falling off a ladder at work. In a written report issued December 7, 1996, Dr. Zimmerman's opinion was that Jordan suffered a whole body permanent impairment of 21 percent. In addition, Dr. Zimmerman imposed work restrictions on Jordan. Although the report failed to indicate whether these restrictions were permanent, Dr. Zimmerman revealed in his June 2002 deposition that the restrictions were permanent.

Dr. Drazek, Dr. Murati, and Hardin all indicated that Jordan's task loss using the restrictions from the February 23, 2000, injury is the same task loss that would have existed using Dr. Zimmerman's 1996 restrictions. Nevertheless, the evidence indicated that Jordan had worked in violation of Dr. Zimmerman's restrictions up until the time of the present injury.

The ALJ awarded Jordan compensation for temporary total disability followed by compensation for a permanent partial disability. Using the 97 percent task loss opinion of Dr. Drazek and a 100 percent wage loss, the ALJ determined that Jordan was entitled to a 99 percent work disability. On appeal, the Board modified the permanent partial disability award. Finding that Jordan had not made a good faith effort to find employment, the Board imputed a wage to Jordan which resulted in a 52 percent wage loss. In addition, the Board averaged together Dr. Drazek's, Dr. Mills', and Dr. Murati's task loss opinions to come up with a 71 percent task loss. Averaging the 52 percent wage loss with the 71 percent task loss, the Board applied a 61.5 percent work disability rating.

*Standard of Review*

Since the 1993 amendments to the Act, the Board has authority to review the decision by the administrative law judge on questions

of law and fact. The Board's decision is then appealable to the Court of Appeals, where review is limited to questions of law in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* Whether the Board's findings of fact are supported by substantial competent evidence is a question of law. *Webber v. Automotive Controls Corp.*, 272 Kan. 700, 703-04, 35 P.3d 788 (2001).

"Although this court may substitute its judgment for that of the Board on questions of law, on disputed issues of fact, an appellate court must view the evidence in the light most favorable to the prevailing party and determine if there is substantial competent evidence to support the Board's determinations. [Citation omitted.]" *Brobst v. Brighton Place North*, 24 Kan. App. 2d 766, 770, 955 P.2d 1315 (1997).

Substantial evidence in workers compensation cases is evidence that possesses something of substance and relevant consequence and carries with it fitness to induce the conclusion that the award is proper, or furnishes a substantial basis of fact from which the issue raised can be reasonably resolved. The appellate court reviews the evidence in the light most favorable to the prevailing party and does not reweigh the evidence or assess the credibility of the witnesses. *Neal v. Hy-Vee, Inc.*, 277 Kan. 1, 16-17, 81 P.3d 425 (2003).

The Workers Compensation Act, K.S.A. 44-501 *et seq.*, is to be "liberally construed for the purpose of bringing employers and employees within its provisions to provide protection of the Act to both. [K.S.A. 44-501(g)]." *Graff v. Trans World Airlines*, 267 Kan. 854, 857, 983 P.2d 258 (1999). Upon determining that the Act applies, it shall be construed "impartially to both employers and employees. K.S.A. 44-501(g)." *Chapman v. Beech Aircraft Corp.*, 258 Kan. 653, 655, 907 P.2d 828 (1995).

*Arising out of and in the Course of Employment*

First, Pyle argues that the Board erred in finding that the claim arose out of and in the course of employment. "Whether an injury arose out of and in the course of employment is a question of fact, and we review for substantial competent evidence. [Citation omit-

ted.]" *Wilson v. Mercy Health Center*, 28 Kan. App. 2d 410, 411, 15 P.3d 853 (2000).

Under the Workers Compensation Act, an employee's injury is compensable if it is caused by accident arising out of and in the course of employment. Our Supreme Court in *Kindel v. Ferco Rental, Inc.*, 258 Kan. 272, 278, 899 P.2d 1058 (1995), defined the terms arising "out of" and "in the course of" employment:

"The two phrases arising 'out of' and 'in the course of' employment, as used in our Workers Compensation Act, K.S.A. 44-501 *et seq.*, have separate and distinct meanings; they are conjunctive, and each condition must exist before compensation is allowable. The phrase 'out of' employment points to the cause or origin of the accident and requires some causal connection between the accidental injury and the employment. An injury arises 'out of' employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Thus, an injury arises 'out of' employment if it arises out of the nature, conditions, obligations, and incidents of the employment. The phrase 'in the course of' employment relates to the time, place, and circumstances under which the accident occurred and means the injury happened while the worker was at work in the employer's service. [Citations omitted.]"

Therefore, in order for the injury to arise "out of" employment, there must be some causal connection between the injury and the conditions of employment. To occur "in the course of" employment, an injury must happen while the employee is at work in the employer's service.

Even those injuries which result from a personal dispute between coworkers are compensable if the employer has reason to anticipate that the injuries would occur if the employees continued to work together. *Harris v. Bethany Medical Center*, 21 Kan. App. 2d 804, Syl. ¶ 2, 909 P.2d 657 (1995). Here, finding that Pyle had reason to anticipate the assault, the Board determined that Jordan suffered a compensable injury:

"The Board concludes the preponderance of the evidence indicates that respondent had ample reason to anticipate the assault as demonstrated by the fact respondent had separated claimant and Mr. Gagnebin from rooming together on an earlier occasion. The respondent was aware of the ongoing dispute and Mr. Gagnebin's continued threatening behavior and not only allowed the two to work together but also again assigned them a room to share. The claimant has met his burden of proof to establish a compensable injury."

We find that there was substantial competent evidence to support the Board's determination. The evidence indicated that Pyle was aware of the ongoing dispute between Jordan and Gagnebin but took no measures to counteract the situation. Although Decker indicated that he was not aware of any dispute between Jordan and Gagnebin until the day of the fights, Jordan's testimony contradicted Decker's statements. "This court does not reweigh the evidence or determine the credibility of the witnesses' testimony. [Citation omitted.]" *Niesz v. Bill's Dollar Stores*, 26 Kan. App. 2d 737, 741, 993 P.2d 1246 (1999).

Jordan's testimony indicated that he had informed the owner of Pyle, as well as Decker and an area foreman, that Gagnebin was threatening him with fighting and that he wanted his own room. Jarvis revealed that he, as well as David Pyle, were aware of the dispute between Jordan and Gagnebin at least a couple of weeks before the fight. Jordan further indicated that although he had a separate room at one time, he was placed back in the same room with Gagnebin in Woodward. By not taking measures to reassign Jordan and Gagnebin to separate rooms and even separate job sites, Pyle had ample reason to anticipate the assault and the resulting injury that occurred in this case.

Furthermore, when Decker told Jordan to get off of Gagnebin and to return to the job site, he had reason to anticipate that Gagnebin might retaliate and injure Jordan. At that point, the two men had engaged in rough physical fighting where Jordan had ended up on top of Gagnebin. By not restraining Gagnebin when ordering Jordan to return to the job site, Pyle, acting through foreman Decker, had reason to anticipate further assault by Gagnebin. Therefore, Jordan's injury was compensable.

Moreover, Jordan's injury was compensable because it arose out of the conditions and incidents of Jordan's employment with Pyle. In *Springston v. IML Freight, Inc.*, 10 Kan. App. 2d 501, Syl. ¶ 2, 704 P.2d 394 (1985), this court noted: "An injury sustained by assault arises out of employment when it arises out of the nature, conditions, obligations and incidents of the employment in the same manner as any other injury." Additionally, this court stated: "If an injury by assault arose out of and in the course of employ-

ment, it is compensable without regard to whether the claimant was the aggressor in the confrontation." 10 Kan. App. 2d 501, Syl. ¶ 3.

Under the facts of this case, Jordan was sent by Pyle to Woodward, Oklahoma, to work on a construction project. He was placed with Gagnebin in a hotel room that was paid for by Pyle. Although Pyle did not cover the cost of the microwave, it was foreseeable that these two men would rent a microwave in order to fix meals. Because Jordan and Gagnebin had a history of not getting along together, it was also foreseeable that these men would come into conflict since they were living and working together in such close quarters. Under *Springston*, whether the initial fight was actually started by Jordan or Gagnebin is irrelevant to a determination of workers compensation benefits. Considering all the circumstances surrounding the assault that occurred to Jordan, it is apparent that his injury arose out of the conditions and incidents of his employment with Pyle.

*Calculation of Benefits*

Next, Pyle argues that even if Jordan's claim is found to be compensable, he should not be entitled to work disability benefits in excess of his functional impairment rating since he was fired for good cause unrelated to his alleged injury.

K.S.A. 44-510e(a) sets forth the measure by which an employee is compensated for an injury resulting in permanent partial disability:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury. In any event, the extent of permanent partial general disability shall not be less than the percentage of functional impairment."

K.S.A. 44-510e(a) further states that an employee who is engaging in any work for wages equal to at least 90 percent of the average gross weekly wage that the employee was earning at the time of

the injury is not entitled to receive permanent partial disability benefits in excess of his or her percentage of functional impairment.

Here, Jordan was not working at the time of the hearing before the Board and, therefore, was not receiving wages equal to at least 90 percent of the average weekly wage that he was earning at Pyle on the date of his injury. Therefore, under K.S.A. 44-510e(a), it appears that Jordan should receive compensation based on his work disability.

Nevertheless, "it is unreasonable to conclude the legislature intended to encourage workers to sit at home, refuse to work, and take advantage of the workers compensation system." *Surls v. Saginaw Quarries, Inc.*, 27 Kan. App. 2d 90, 94, 998 P.2d 514 (2000). Thus, a claimant must still make a good faith effort to find a job within the imposed work restrictions. *Cavender v. PIP Printing, Inc.*, 31 Kan. App. 2d 127, 130, 61 P.3d 101 (2003).

Moreover, an employer can limit its work disability liability under K.S.A. 44-510e(a) by placing an injured employee in an accommodated position that the employee is able to perform at a comparable wage. *Copeland v. Johnson Group, Inc.*, 26 Kan. App. 2d 803, 806, 995 P.2d 369 (1999), *rev. denied* 269 Kan. 931 (2000). The Act, however, does not impose an affirmative duty upon the employer to offer an accommodated position. *Oliver v. Boeing Co.*, 26 Kan. App. 2d 74, 77, 977 P.2d 288 (1999).

Pyle bases its argument that Jordan's compensation should be limited to his functional impairment rating primarily on *Ramirez v. Excel Corp.*, 26 Kan. App. 2d 139, 979 P.2d 1261, *rev. denied* 267 Kan. 889 (1999), and *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995). In addition, this court relied on *Perez v. IBP, Inc.*, 16 Kan. App. 2d 277, 826 P.2d 520 (1991), when reaching its decision in *Ramirez*. All of these decisions discussed below are distinguishable from the facts here. In *Ramirez* and *Foulk*, the facts show that each employee was offered an accommodated position. In *Perez*, the employee was able to return to his job after he was injured. Here, Jordan was never offered an accommodated position.

In *Ramirez,* the employer had provided an accommodated position for the claimant after he had been injured on the job. The claimant was subsequently fired from his accommodated position for failing to disclose a prior workers compensation injury on his employment application. The ALJ awarded benefits based on Ramirez' functional impairment rating. The Board, however, determined that the claimant was entitled to compensation based on his work disability.

On appeal to this court, the employer in *Ramirez* argued that the presumption against work disability applied in this case because claimant returned to work in an accommodated position after his injury and before he was fired for good cause. Finding that the case was controlled by *Perez v. IBP, Inc.,* 16 Kan. App. 2d 277, 826 P.2d 520 (1991), and *Foulk v. Colonial Terrace,* 20 Kan. App. 2d 277, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995), this court determined that the claimant should be limited to an award based on his functional impairment. 26 Kan. App. 2d at 139-43.

In *Perez,* this court affirmed the trial court's award limiting the claimant to his functional impairment. There, the claimant had worked for 5 hours the day after the accident, had worked full shifts in the next 3 days, and had worked 33 out of 57 possible work days after the accident before he was fired for poor attendance. This court noted that K.S.A. 1990 Supp. 44-510e(a) "creates a presumption that no work disability exists under circumstances where the worker returns to the same work, for the same wage, after an injury." 16 Kan. App. 2d at 279. This court determined that there was a substantial basis for the trial court's determination that there was no work disability. 16 Kan. App. 2d at 279.

In *Foulk,* this court affirmed the Board's decision limiting the claimant to her functional impairment rating. After the claimant had injured her back and been placed on work restrictions, the employer offered the claimant an accommodated job at the same wage. The claimant did not accept the position. On appeal, the claimant argued that the presumption of no work disability found in K.S.A. 44-510e failed to apply where the worker has the ability

to engage in work for comparable wages but does not do so. In rejecting the claimant's argument, this court stated:

"Construing K.S.A. 1988 Supp. 44-510e(a) to allow a worker to avoid the presumption of no work disability by virtue of the worker's refusal to engage in work at a comparable wage would be unreasonable where the proffered job is within the worker's ability and the worker has refused to even attempt the job." 20 Kan. App. 2d at 284.

*Ramirez, Perez,* and *Foulk* are all distinguishable from the facts here because there was never an offer for Jordan to return to work at Pyle. Therefore, it is left to mere conjecture whether Pyle would have offered Jordan an accommodated position if he had not been terminated.

Nevertheless, Pyle maintains that if Jordan had not been rightfully terminated for starting a fight, he could still be working for Pyle earning a comparable wage in an accommodated position. Pyle maintains that Jordan was fired for punching Gagnebin and starting the fight.

Both the ALJ and the Board rejected Pyle's argument. In finding that Jordan was entitled to a work disability assessment, the ALJ noted: "Claimant was terminated for defending himself against an attacker with a knife. Claimant was cut, slashed and stabbed by the attacker who was ultimately convicted of aggravated assault and battery with a deadly weapon with the intent to kill." On appeal, the Board found that Jordan should be compensated for his work disability based on "the absence of evidence of a written policy regarding fighting or evidence that claimant had been advised of such policy as well as the fact the claimant was clearly defending himself in the second incident when Mr. Gagnebin attacked him with a knife."

As discussed above, when reviewing the Board's factual findings, we are limited to determining whether they are supported by substantial competent evidence. *Condon v. Boeing Co.*, 21 Kan. App. 2d 580, 587, 903 P.2d 775 (1995). An appellate court will uphold findings supported by substantial evidence even though evidence in the record would have supported contrary findings. *Webber*, 272 Kan. at 705.

Here, although Pyle claimed to have a "no tolerance" policy towards fighting, the Board determined that no written policy existed. Moreover, the Board found that no evidence was presented that Jordan was ever told about a no-fighting rule before his altercations with Gagnebin. Furthermore, the evidence indicates that when the first incident ended, Decker told Jordan to go to the work site. Moreover, after the second incident was over and Jordan was at the emergency room, David Pyle told him that his medical bills would be covered. Decker's and David's conduct after the altercations was clearly incompatible with Pyle's assertions that it had a strict no-fighting rule and that Jordan was fired for fighting.

Nevertheless, Pyle maintains that there is no legitimate question as to whether Jordan's actions of throwing a punch at a coworker are grounds for termination. Although Jordan may have been at fault, he was not the aggressor in either the verbal assault or in the physical encounters. The record indicates that Jordan threw a punch only after Gagnebin had threatened him, yelled at him, and shoved him. Jordan testified that he did not start the fight and that he tried to "diffuse" Gagnebin. The Board points out that Jordan was defending himself when Gagnebin attacked him in the second fight. The evidence reveals that Jordan was walking out of the building and was not behaving in an aggressive manner when Gagnebin attacked and stabbed him.

In addition, in finding that Pyle was aware of and condoned the worsening animosities between the two employees, the Board stated: "The record shows respondent was aware of the problems between claimant and Mr. Gagnebin but that no preventative action was taken." This finding is amply supported by the evidence. The record indicates that the entire chain of events arose out of the fact that work brought Jordan and Gagnebin together. These compelled contacts between Jordan and Gagnebin aggravated their animosities toward each other. Moreover, these contacts necessitated by their job had a causal effect in producing the physical altercations.

After the Board determined that Jordan was entitled to a work disability analysis, it went on to find that Jordan had failed to make a good faith effort to find employment. The Board reviewed the

list of businesses that Jordan had contacted from July 6, 2001, through March 12, 2002. Although there were approximately 55 contacts on the list, the Board noted that Jordan had applied at only 15 different employers. The majority of these employers were involved in construction or heavy labor activities that Jordan could no longer perform. The Board concluded that applying at only 15 employers from July 2001 through March 2002 and applying for positions outside of Jordan's restrictions did not constitute a good faith effort to find employment. After reviewing the testimonies of Hardin and Terrill as to Jordan's wage-earning ability, the Board imputed to Jordan an hourly wage of $7.75 and used this figure in determining his work disability.

After reviewing the record on appeal, we determine that there was substantial competent evidence to support the Board's decision on this issue. We agree that Jordan's actions of applying over the course of 8 months at only 15 different employers, many of which were involved in work that he could no longer perform, did not constitute a good faith effort to find employment. In *Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d 306, 320, 944 P.2d 179 (1997), this court stated: "If a finding is made that a good faith effort has not been made, the factfinder will have to determine an appropriate post-injury wage based on all the evidence before it, including expert testimony concerning the capacity to earn wages." Once the Board found that Jordan had failed to make a good faith effort to find employment, it properly imputed a post-injury wage to Jordan based on Hardin's and Terrill's testimonies.

*Additional Compensation*

Next, Pyle argues that the Board erred in its determination that the $15 per day payment for meals constituted part of Jordan's wage. Pyle's argument requires us to interpret K.S.A. 44-511, which sets forth what constitutes wages in determining an employee's average gross weekly wage. Issues involving interpretation of statutory provisions are questions of law over which appellate courts have unlimited review. While an appellate court gives deference to the Board's interpretation of the law, if the Board's in-

terpretation is erroneous, the appellate court may take corrective action. *Neal v. Hy-Vee, Inc.*, 277 Kan. 1, 11, 81 P.3d 425 (2003).

Under K.S.A. 44-511(a)(3), the term "wage" means "the total of the money and any additional compensation which the employee receives for services rendered for the employer . . . ." "Money" is defined as "the gross remuneration . . . at which the service rendered is recompensed in money by the employer." K.S.A. 44-511(a)(1). The term "money" does not include additional compensation, payments in a form other than cash, "or any other compensation or benefits received by the employee from the employer or any other source." K.S.A. 44-511(a)(1). "Additional compensation" includes:

"[B]oard and lodging when furnished by the employer as part of the wages, which shall be valued at a maximum of $25 per week for board and lodging combined, unless the value has been fixed otherwise by the employer and employee prior to the date of the accident, or unless a higher weekly value is proved." (Emphasis added.) K.S.A. 44-511(a)(2)(C).

The Board included within Jordan's average weekly wage the $15 per day payment. Finding that the payment constituted economic gain to Jordan, the Board stated: "As the records indicate, this money may be used by claimant in any manner he sees fit. As the claimant may apply this money for his meals, an expense that he would have had, unlike the lodging expense, notwithstanding his employment activities, there exists economic gain."

In reaching this decision, the Board cited to *Ridgway v. Board of Ford County Comm'rs*, 12 Kan. App. 2d 441, 748 P.2d 891 (1987), *rev. denied* 242 Kan. 903 (1988). There, this court determined that the term "wage" under K.S.A. 44-511(a)(3) "includes any allowance which constitutes a payment for work performed to the extent it results in an economic gain to the employee." 12 Kan. App. 2d 441, Syl. ¶ 1. This court was asked to review the district court's decision to include the claimant's car allowance and uniform cleaning allowance in his average weekly wage. This court determined that the car allowance which was paid in addition to reimbursement for gas, oil, and tires was given in consideration for work and constituted an economic gain to the claimant. In reaching this decision, this court noted that the evidence indicated that the

car allowance was not simply reimbursement for "out-of-pocket work-related expenses." This court held that the car allowance was properly included in the claimant's average gross weekly wage. Regarding the uniform cleaning allowance, however, this court found that the record did not affirmatively show that this payment constituted true economic gain for the claimant. Therefore, the uniform cleaning allowance should not be included in the claimant's average gross weekly wage. 12 Kan. App. 2d at 442-45.

The facts of *Ridgway* differ from those in the instant case because in *Ridgway*, there was no specific statutory provision relating to the allowances paid by the employer. Here, K.S.A. 44-511(a)(2)(C) specifically includes within "additional compensation" the board and lodging expenses that are "furnished by the employer as part of the wages." By having this specific statutory provision, the legislature has implicitly decided that payments for board and lodging expenses, "when furnished by the employer as part of the wages," constitute economic gain to the employee. Although Jordan received the $15 per day payment separately from his paycheck, it is clear that this payment constituted part of his wages that he received for working in Oklahoma. As the Board points out, it is clear that the $15 per day payment did constitute economic gain to Jordan because he would have had to pay for meals regardless of his employment.

## Pre-existing Task Loss

Next, Pyle contends that Jordan's work disability should be reduced by the amount of task loss that Jordan suffered from a previous workers compensation injury that occurred in 1996.

In making this argument, Pyle fails to point us to any place in the record where there is documentation of the prior workers compensation case filed by Jordan against his employer. Nevertheless, from responses that were elicited from Jordan at the hearing in this case, we gather that Jordan entered into a settlement for the prior workers compensation injury. Included in the record on appeal is a report from Dr. Daniel Zimmerman who examined Jordan once in 1996. Jordan was seen by Dr. Zimmerman after suffering injury at work that affected his cervical spine, right hip, and right

hand and wrist. After examining Jordan, Dr. Zimmerman opined that Jordan sustained a 21 percent whole body permanent impairment. In addition, Dr. Zimmerman imposed permanent work restrictions, including limiting Jordan's lifting to 50 pounds on an occasional basis and 25 pounds on a frequent basis.

Pyle points out that Dr. Drazek, Dr. Murati, and Hardin all indicated that Jordan's task loss using the restrictions from his current injuries is the same task loss that would have existed using Dr. Zimmerman's 1996 restrictions. Thus, Pyle contends that the evidence fails to show that Jordan's task loss has increased and, therefore, his recovery should be limited to his functional impairment.

In addressing Pyle's argument on this issue, the Board stated:

"Respondent argues the preexisting tasks lost due to restrictions imposed before claimant's present injury should be eliminated from the task lists in analyzing claimant's current task loss. The Board, however, considers it inappropriate to eliminate tasks that claimant performed during the relevant 15-year period prescribed by statute. The work disability formula provided by K.S.A. 44-510e(a) requires consideration be given to all 'the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident.' When the disability was found to be an aggravation of a preexisting condition, a deduction for any preexisting disability is to be made pursuant to K.S.A. 44-501(c). And the evidence indicates that after his prior injury, he could, and in fact did, perform most if not all of the job tasks he had previously performed."

In arguing that the Board's decision on this issue was erroneous, Pyle points to *Miner v. M. Bruenger & Co.*, 17 Kan. App. 2d 185, 836 P.2d 19 (1992). There, Miner had suffered a lower back injury in November 1987 for which he received workers compensation benefits. Miner had a 20% permanent impairment resulting from the 1986 injury. In June 1987, Miner's treating physician released him to return to work with restrictions of " 'no lifting at all and no unloading.' " 17 Kan. App. 2d at 187.

In October 1987, Miner again injured his lower back at work after his truck went into a ditch. Miner's treating physician testified that this second injury increased Miner's whole body functional impairment from 20% to 25-30%. Although the vocational rehabilitation expert testified that Miner had a work disability of between 53 to 68 percent, he failed to consider any permanent re-

strictions from Miner's previous injury in this determination. In finding the vocational expert's testimony unpersuasive, the trial court stated:

" '[I]t appears that in arriving at his opinions, Mr. Hardin failed to consider the limitations and restrictions on the claimant's physical abilities which were attributable to the claimant's prior injury and were present before the claimant was ever hired by respondent. As a result, Mr. Hardin's opinions do not accurately reflect the reduction in the claimant's ability to obtain work in the open labor market and to earn a comparable wage which can be attributed to this injury.' " 17 Kan. App. 2d at 189-90.

The trial court awarded compensation to Miner based on a 30 percent permanent partial disability rating. On appeal, this court found that there was substantial competent evidence to support the trial court's decision. 17 Kan. App. 2d at 186-90.

*Miner* is distinguishable from the present case. In *Miner*, there were only 4 months that separated the date that Miner was released to return to work from his first injury and the date that Miner was again injured. Here, a few years separated Jordan's 1996 injury and his current injury. The evidence in this case indicated that Jordan's previous injury had been resolved and that he was able to perform those tasks that he had done before his 1996 injury. Specifically, Jordan had been working in violation of Dr. Zimmerman's restrictions up until the time of the present injury. In addition, although Dr. Zimmerman testified that the restrictions issued by him were permanent, Dr. Drazek believed that the restrictions were based on injuries that should fully heal in a person as young as Jordan and were not permanent. Dr. Murati further believed that these restrictions were unrealistic.

Moreover, unlike the facts of *Miner*, there is evidence in the record that Jordan's treating physician, Dr. Tanksley, released him with no permanent restrictions after the 1996 injury. Again, we point out that we have not been provided with any information about the award or settlement that was reached in this case. Therefore, we can only guess whether Jordan's settlement was based on temporary disability benefits or permanent disability benefits or a combination of the two. Nevertheless, with the evidence in the record indicating that Jordan was released by his treating physician

with no permanent restrictions and that Jordan was able to perform his job tasks without the restrictions imposed by Dr. Zimmerman up until the time of his current injury, we find that the facts and rationale in *Miner* are distinguishable from this case.

Here, in determining that the restrictions imposed for Jordan's previous injury should not affect the task loss for his current injury, the Board stated: "[T]he evidence indicates that after his prior injury, he could, and in fact did, perform most if not all of the job tasks he had previously performed." The Board's statement is supported by Dr. Drazek's testimony that she believed Dr. Zimmerman's restrictions were not permanent. Dr. Drazek believed that these restrictions were based on injuries that should fully heal in someone Jordan's age. Further support for the Board's statement is found in Dr. Murati's testimony that he believed Dr. Zimmerman's restrictions were unrealistic.

Obviously, the Board decided to believe the testimonies of these expert witnesses rather than Dr. Zimmerman's testimony that the restrictions for the previous injury were permanent. As set forth in *Armstrong v. City of Wichita*, 21 Kan. App. 2d 750, 759, 907 P.2d 923 (1997): " 'If the expert medical witnesses cannot agree, who is to decide the case? Obviously, the court must make the decision, and by law it is qualified to do so.' " (quoting *Hanna v. Edward Gray Corporation*, 197 Kan. 793, 800, 421 P.2d 205 [1966]). See also *Bradford v. Boeing Military Airplanes*, 22 Kan. App. 2d 868, 871, 924 P.2d 1263, *rev. denied* 261 Kan. 1084 (1996) (generally, appellate court does not reweigh evidence or evaluate credibility of witnesses).

Upon reviewing the Board's decision on this issue, we find that there was substantial competent evidence to support the Board's decision.

Affirmed.